PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3372
_____

ROBERT FREEDMAN,

Appellant

v.

SUMNER M. REDSTONE; PHILIPPE P. DAUMAN;
THOMAS E. DOOLEY; GEORGE S. ABRAMS;
ALAN C. GREENBERG; SHARI REDSTONE;
FREDERIC V. SALERNO; BLYTHE J. MCGARVIE;
CHARLES E. PHILLIPS, JR.; WILLIAM SCHWARTZ;
ROBERT K. KRAFT; VIACOM, INC.

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. No. 1-12-cv-01052)
District Judge: Honorable Sue L. Robinson
_____

Argued March 25, 2014

BEFORE: FUENTES, GREENBERG, and
VAN ANTWERPEN, Circuit Judges

(Filed: May 30, 2014)
_____

Daniel E. Bacine, Esq.
Barrack, Rodos & Bacine
2001 Market Street
3300 Two Commerce Square
Philadelphia, PA 19103

A. Arnold Gershon, Esq. **(Argued)**
Barrack, Rodos & Bacine
425 Park Avenue
Suite 3100
New York, NY 10022

Brian E. Farnan, Esq.
Joseph J. Farnan, Jr., Esq.
Joseph J. Farnan, III, Esq.
Rosemary J. Piergiovanni, Esq.
Farnan Law
919 North Market Street, 12th Floor
Wilmington, DE 19801

   Counsel for Appellant

Jaculin Aaron, Esq.
Stuart J. Baskin, Esq. **(Argued)**
Shearman & Sterling

599 Lexington Avenue
New York, NY 10022

John P. DiTomo, Esq.
Jon Abramczyk, Esq.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

    Counsel for Appellees

————————

OPINION OF THE COURT
————————

GREENBERG, <u>Circuit Judge</u>.

## I.  INTRODUCTION

Between 2008 and 2011, Viacom Inc. paid three of its senior executives—Board chairman Sumner Redstone, President and CEO Philippe Dauman, and COO Thomas Dooley—more than $100 million in bonus or incentive compensation. Although the compensation exceeding $1 million paid by a corporation to senior executives is not typically a deductible business expense under federal tax law, a corporate taxpayer may deduct an executive's otherwise nondeductible compensation over $1 million if an independent committee of the corporation's board of directors approves the compensation

3

on the basis of objective performance standards and the compensation is "approved by a majority of the vote in a separate shareholder vote" before the compensation is paid. In 2007, a majority of Viacom's voting shareholders approved such a plan with the intent to render the excess compensation paid by Viacom tax deductible (the "2007 Plan"). One shareholder, appellant Robert Freedman, now claims that Viacom's Board of Directors (the "Board") failed to comply with the terms of the 2007 Plan. Freedman contends that, instead of using quantitative performance measures, the Board partially based its bonus awards on qualitative, subjective factors, thus destroying the basis for their tax deductibility. Freedman alleges that this misconduct caused the Board to award its executives more than $36 million of excess compensation. Freedman sued Viacom and all eleven members of its Board derivatively on behalf of Viacom for not complying with the 2007 Plan, and directly for allowing an allegedly invalid shareholder vote reauthorizing the 2007 Plan in 2012. On defendants' motion, the District Court dismissed both claims by order entered on July 16, 2013. See Freedman v. Redstone, Civ. No. 12-1052-SLR, 2013 WL 3753426 (D. Del. July 16, 2013). Freedman has appealed from that order but we will affirm.

At the outset we summarize the issues involved in this case and set forth our conclusions. In a requirement familiar to corporate litigators, before bringing a derivative suit on behalf of a corporation a plaintiff must demand that the corporation's board of directors bring the suit itself. If the plaintiff does not make such a demand, the suit may proceed only if the plaintiff shows why a demand would have been futile, either because the board was interested in the challenged transaction or because the

4

board acted outside the protection of the business judgment rule in dealing with the matter in issue. As Freedman did not make a pre-suit demand or present sufficient allegations explaining why a demand would have been futile, the District Court correctly dismissed his derivative claim.

Freedman on his direct claim contends that, as a condition for allowing certain executive compensation in excess of $1 million to be tax deductible, federal tax law requires that the compensation be awarded pursuant to a plan approved in a vote of all the shareholders, even those otherwise without voting rights, thus preempting to this limited extent Delaware law authorizing corporations to issue non-voting shares as Viacom has done. Because we find that federal tax law does not confer voting rights on shareholders not otherwise authorized to vote or affect long-settled Delaware corporation law which permits corporations to issue shares without voting rights, we conclude that Freedman has failed to state a direct claim on which relief may be granted.

## II.    BACKGROUND

Viacom is a publicly traded entertainment corporation, incorporated in Delaware, with its principal place of business in New York, New York. Viacom's Board of Directors has eleven members, all of whom are defendants in this case. During the 2011 fiscal year, Viacom earned more than $2 billion, and returned a substantial portion of those profits to its stockholders through cash dividends and stock buyback programs.

As we have indicated, Freedman's allegations center on the award of millions of dollars of incentive compensation to three Viacom executives. We reiterate that typically executive compensation exceeding $1 million is not tax deductible, but that 26 U.S.C. § 162(m) provides an exception to the rule of nondeductibility where the corporation pays the compensation as a reward for performance measured by established, objective criteria and an independent compensation committee of the corporation's directors administers the compensation plan. 26 U.S.C. § 162(m)(4)(C)(i); 26 C.F.R. § 1.162-27(e)(2)(i). In order for compensation paid pursuant to the exception to qualify for the favorable tax treatment, the taxpayer must disclose to its shareholders its plan to award such compensation and the plan must be "approved by a majority of the vote in a separate shareholder vote." 26 U.S.C. § 162(m)(4)(C)(ii).

On May 30, 2007, Viacom's shareholders approved this type of plan—the Senior Executive Short-Term Incentive Plan. The 2007 Plan capped the awards, limiting each executive's eligibility for awards to the lesser of either eight times his salary or $51.2 million per year. As these bonuses vastly exceeded § 162(m)'s $1 million threshold, to ensure that the awards were tax deductible the 2007 Plan included provisions tying bonus awards to the achievement of specific, objective goals relating to Viacom's financial performance. The plan directed the Compensation Committee of Viacom's Board to establish a performance period, designate which executives would participate, select which performance goals to use from a list included in the 2007 Plan, and set a performance target within each goal. At the end of the performance period, the Committee was to certify "whether the performance targets have been

achieved in the manner required by Section 162(m)." A. 63. If the targets were satisfied, then the executives earned the award, although the Committee could, "in its sole discretion, reduce the amount of any Award to reflect" its assessment of a particular executive's "individual performance or for any other reason." A. 63-64.

The Committee selected several performance measures from the 2007 Plan and then set a range of performance goals for each measure. Each executive was eligible to receive a bonus of different amounts, depending on where on the range Viacom's performance ultimately fell. Each executive was assigned a "target" bonus and, depending on Viacom's actual performance, an executive's bonus could be anywhere from 25% to 200% of the target. Because the Committee selected more than one performance measure, the Committee weighted each measure and then combined the weighted percentage with Viacom's performance to calculate each executive's award.

According to Freedman, the Committee failed to comply with the foregoing procedure. He contends that, in addition to the objective performance measures drawn from the 2007 Plan, "the Committee also used subjective, non-financial qualitative factors to determine approximately 20% of the bonus awarded to each Officer," and "wrongfully arrogated to itself the positive discretion to provide additional compensation based on the accomplishments of each executive in a particular year." A. 41-42. The Committee allegedly used "positive discretion" to increase the executives' bonuses, resulting in an "excess" award of $36,645,750. A. 42-47.

The complaint quantifies the difference between the "earned" bonus and the actual bonus for each executive in each of the three years at issue (2008, 2009, and 2010). For example, in 2008 the Committee set Dauman's "target bonus" at $9.5 million (significantly less than the maximum bonus awards authorized by the 2007 Plan). The Committee selected two performance goals: Operating Income, weighted at 34%, and Free Cash Flow, weighted at 29%. It also assigned 20% weight to qualitative factors.

The Committee then used these weighted factors—all of which were satisfied—to reduce Dauman's actual bonus to $7,885,000 (83% of the target). Freedman argues that the 20% of the ultimate award attributable to qualitative factors was improper, and thus Dauman received $1.9 million in excess compensation. A. 42-43. Freedman characterizes this metric as a violation of both the 2007 Plan and 26 U.S.C. § 162(m), and calculates the total amount of excess compensation awarded to the three executives to be $36 million.

Treasury Regulations require corporations to obtain stockholder approval of executive compensation plans every five years, 26 C.F.R. § 1.162-27(e)(4)(vi), and Viacom thus sought stockholder approval of its compensation plan in 2012 (the "2012 Plan"). Viacom's certificate of incorporation established two classes of stock: Class A shares, which have one vote per share, and Class B shares, which are not "entitled to any votes upon any questions presented" to Viacom's stockholders. A. 156 (Certificate of Incorporation). Because Redstone owns 79.5% of Class A shares and obviously favored adoption of the plan, Freedman reasonably contends that the passage of the 2012

Plan was guaranteed "no matter what the other stockholders wanted."[1]  A. 50.  On March 8, 2012, the Class A shareholders voted to approve the 2012 Plan.

On August 17, 2012, in response to the adoption and implementation of the plan, Freedman filed a complaint in the District of Delaware against all eleven Board members and Viacom, asserting both a derivative and a direct claim.  The derivative claim alleged that the Board wrongfully authorized the payment of excessive compensation.  Freedman contended that this authorization was an act of disloyalty and waste, and unjustly enriched the recipients of the compensation.  Therefore, in Freedman's view, the authorization was not the product of a valid exercise of business judgment.  The direct claim asserted that the shareholder vote on the 2012 Plan violated 26 U.S.C. § 162(m) because Class B shareholders could not participate in the vote.   Freedman reads § 162(m) as requiring that <u>all</u> shareholders be eligible to vote on plans to award tax-deductible compensation, thus, to that limited extent, preempting Delaware law which permits corporations to issue non-voting shares.  Under this reading, Viacom, by excluding Class B shareholders

---

[1] Redstone also owns a large block of Class B shares but that point is immaterial.

[2] Freedman contends that the District Court also had federal question and supplemental jurisdiction, <u>see</u> 28 U.S.C. §§ 1331, 1340, and 1367, but we need not address this possibility.

[3] The five independent directors are current and former members of the Compensation Committee.  The five directors who are not independent include the three executives receiving the compensation at issue (Redstone, Dauman, and Dooley), as well

from the shareholder vote, did not satisfy federal law insofar as the vote was intended to render the excess compensation tax deductible. Freedman sought more than $36 million in damages, injunctive relief preventing enforcement of the 2012 Plan, and a new vote—that would include Class B shareholders—to approve or reject the 2012 Plan.

Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 23.1 because Freedman had not made a pre-suit demand on the Board, and under Rule 12(b)(6) because his complaint failed to state a valid claim. On July 16, 2013, the District Court granted defendants' motion to dismiss. Freedman, 2013 WL 3753426, at *11. The Court concluded that Freedman had failed to show that pre-suit demand on Viacom would have been futile, and had not sufficiently alleged facts that created a reasonable doubt that the Board took its challenged actions after its valid exercise of business judgment. Therefore, the Court dismissed the derivative claim. In dismissing Freedman's direct claim, the Court rejected Freedman's argument that 26 U.S.C. § 162(m) preempted Delaware corporation law with respect to shareholder approval of the compensation plan. Freedman has appealed from both aspects of the July 16, 2013 order.

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court had diversity of citizenship jurisdiction over Freedman's state law claims under 18 U.S.C. §

10

1332(a)(1), and we have jurisdiction under 28 U.S.C. § 1291.[2] We review a district court's ruling on demand futility for abuse of discretion.  Kanter v. Barella, 489 F.3d 170, 175 (3d Cir. 2007).  But to the extent that a party challenges the legal precepts employed by a district court, we apply plenary review. Blasband v. Rales, 971 F.2d 1034, 1040 (3d Cir. 1992). We also apply plenary review to the District Court's dismissal of Freedman's complaint under Federal Rule of Civil Procedure 12(b)(6).  See Jones v. ABN Amro Mortg. Grp., Inc., 606 F.3d 119, 123 (3d Cir. 2010).  We accept all of Freedman's factual allegations in the complaint as true and construe the complaint in the light most favorable to him.  Id.  In making our determination, we may consider "'an indisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" Steinhard Grp. Inc. v. Citicorp., 126 F.3d 144, 145 (3d Cir. 1997) (quoting Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining that courts may rely on documents extrinsic to the complaint on which the complaint is based). Like the District Court, we therefore consider the 2007 Plan, Viacom's 2012 proxy statement, and Viacom's certificate of incorporation.

---

[2] Freedman contends that the District Court also had federal question and supplemental jurisdiction, see 28 U.S.C. §§ 1331, 1340, and 1367, but we need not address this possibility.

11

# IV.  DISCUSSION

We reiterate that Freedman's complaint alleged both a derivative and a direct claim and we agree with the District Court's order dismissing both claims.  First, the derivative claim fails because Freedman did not meet the requirements to excuse him from making a demand on the Board to bring the action on the theory that it would have been futile to make the demand.  In this regard, Freedman did not comply with Rule 23.1, which requires plaintiffs to plead with particularity their efforts to obtain the desired action from the directors or the reasons for not obtaining the action or making the effort to obtain that action.  Inasmuch as the complaint did not set forth any such facts, the requirement that Freedman make a demand was not excused.  Second, the Court properly dismissed the direct claim under Rule 12(b)(6) because the claim failed to state a cause of action.

## A.    Freedman's Derivative Claim

As we have indicated, before bringing a derivative suit, a shareholder must make a pre-suit demand on the company's board of directors to give the board an opportunity to bring the suit on behalf of the corporation.  In re Merck & Co., Sec., Derivative & ERISA Litig., 493 F.3d 393, 399 (3d Cir. 2007); see also Fed. R. Civ. P. 23.1(b)(3) (requiring derivative complaints to "state with particularity" any attempted demand or the reasons for not making the demand, i.e. why a demand would have been futile); Del. Ch. Ct. R. 23.1 (same).  Although Federal Rule of Civil Procedure 23.1 provides the procedural vehicle for addressing the adequacy of a derivative plaintiff's

12

pleadings, "[t]he substantive requirements of demand are a matter of state law." Blasband, 971 F.2d at 1047-48. The decision whether to bring a lawsuit is "a decision concerning the management of the corporation and consequently is the responsibility of the directors." Id. at 1048 (citing Levine v. Smith, 591 A.2d 194, 200 (Del. 1991)). Because a derivative suit potentially could intrude into the sphere of managerial control, the demand requirement balances the interest of shareholders in pursuing valid claims against the interests of the board in managing the corporation. Id.

But a court may excuse a plaintiff from satisfying the pre-suit demand requirement if the demand would have been futile because the board could not make an independent decision on the question of whether to bring the suit. In general, "directors are entitled to a presumption that they were faithful to their fiduciary duties," and the putative plaintiff bears the burden of overcoming this presumption. Beam ex. rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1048-49 (Del. 2004) (emphasis omitted); see also Levine, 591 A.2d at 205-06. To meet that burden under Delaware law, a complaint must include particularized facts creating reasonable doubt either that (1) "the directors are disinterested and independent," or that (2) "the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984). "[I]f either prong is satisfied, demand is excused." Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000).

1. Interest and Independence of Viacom's Board

13

As we set forth at the outset, Viacom's Board of Directors has eleven members, and all are defendants and appellees in this case. The parties agree that five of the directors are independent, and that five are not.[3] Accordingly, to the extent that the case turns on the independence of the Viacom Board of Directors, the critical question is whether the eleventh director, Alan Greenberg, was independent. Viacom classified Greenberg as an independent director under its Corporate Governance Guidelines and the NASDAQ listing standards. However, the complaint alleges that Greenberg is not independent because he "is a long-time close personal friend and an adviser to Sumner Redstone." A. 48 (Complaint ¶ 49). Freedman supports this allegation by citing In re Viacom Inc. Shareholder Derivative Litigation, No. 602527/05, 2006 N.Y. Misc. LEXIS 2891, at *10-12 (Sup. Ct. June 26, 2006) (In re: Viacom), in which a New York judge determined that the plaintiffs' complaint contained allegations sufficient to create a reasonable doubt that Greenberg was interested in the transaction at issue.[4] Freedman argues that this 2006 New York

---

[3] The five independent directors are current and former members of the Compensation Committee. The five directors who are not independent include the three executives receiving the compensation at issue (Redstone, Dauman, and Dooley), as well as Redstone's daughter, Shari Redstone, and George Abrams. We do not focus on the distinction between the Board as a whole and the Compensation Committee as Freedman does not contend that either body usurped a function of the other.

[4] In re: Viacom has a subsequent case history but we need not discuss it as it is not material to our result. See In re: Viacom,

14

Supreme Court case conclusively decided that Greenberg is not independent, and that appellees thus are precluded from relitigating his independence under the doctrine of collateral estoppel.

Collateral estoppel bars relitigation where "the identical issue necessarily [was] decided in the prior action and [is] decisive of the present action," and "the party to be precluded from relitigating the issue . . . had a full and fair opportunity to contest the prior determination." Kaufman v. Eli Lilly & Co., 482 N.E.2d 63, 67 (N.Y. 1985).[5] The party, in this case Freedman, asserting that another party is collaterally estopped on a particular point has the burden of demonstrating that the issue on which he contends that other party is estopped was raised in the prior proceeding and was identical to the issue in the present proceeding.[6] Howard v. Stature Elec., Inc., 986

No. M-6074, 2006 N.Y. App. Div. LEXIS 14718 (N.Y. App. Div. Nov. 30, 2006).

[5] The law of the state of the issuing court—here, New York law—determines the preclusive effects of a judgment. Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 145 (3d Cir. 1999).

[6] Freedman attempts to shift the burden on the issue to appellees. He incorrectly claims that a prior determination "is preclusive in the second case, unless there is an affirmative showing of changed circumstances." Appellant's br. at 13. The New York Court of Appeals, in assessing whether a prior determination that directors were independent precluded

15

N.E.2d 911, 914 (N.Y. 2013). In demand futility cases, a prior ruling on a director's independence does not necessarily apply in a future proceeding addressing the same topic.[7] See Bansbach v. Zinn, 801 N.E.2d 395, 402 (N.Y. 2003) (explaining that prior ruling on directors' independence in demand futility context did not apply "for all time and in all circumstances"). A determination of a director's independence thus is concerned with a possibly fluid relationship and, accordingly, differs from the determination of a fixed historical fact in the first litigation such as a determination of which automobile went through a red light in an automobile accident case.

We find that Freedman has failed to carry his burden to show that the issue here is identical with the issue that the New York Supreme Court decided in In re: Viacom. In re: Viacom

plaintiffs from claiming they were not independent, placed the burden on the party asserting that collateral estoppel was applicable to show the identity of the issues in the successive litigation and did not automatically assume that the result in the prior case was preclusive in the latter case. Bansbach v. Zinn, 801 N.E.2d 395, 402 (N.Y. 2003). We thus will decline Freedman's invitation to overturn the long-settled principle that the party asserting collateral estoppel must show the identity of issues in order to invoke it. See, e.g., Kaufman, 482 N.E.2d at 67 ("The party seeking the benefit of collateral estoppel has the burden of demonstrating the identity of the issues….").

[7] In his brief, Freedman indicates that "[t]he sole basis for Greenberg's alleged lack of independence is issue preclusion." Appellant's br. at 21.

16

was a derivative action that various shareholders brought in 2006 against Viacom's Board of Directors. The plaintiffs in that case alleged that the Board breached its fiduciary duty by approving excessive compensation packages—totaling more than $159 million in one year—to three Viacom executives, including Redstone. 2006 N.Y. Misc. LEXIS 2891, at *2, *6-7. Greenberg was one of the Board members approving the compensation. The complaint alleged that Greenberg had a "long-standing close business and personal relationship with Redstone," id. at *10 (internal quotation marks omitted), and, as Redstone's personal investment banker, that Greenberg directly advised him on two large acquisitions in 1993 and 1994 and on the unwinding of one acquisition in 2004. Id. at *11. Based on these facts—that Greenberg had "advised Redstone in his personal affairs in two large acquisitions, provided services and continues to provide services to Viacom"—the court concluded that plaintiffs had advanced a reasonable claim that Greenberg was interested in the transaction. Id. at *11-12. The court explained that the financial benefits Greenberg had received or potentially would receive as a result of his relationship with Redstone created an impermissible "taint of interest." Id. at *12.

But the issues here are not identical with those that the court considered in In re: Viacom. First, unlike the complaint in In re: Viacom, Freedman's complaint does not include any allegations regarding specific transactions in which Greenberg participated, and does not claim that Greenberg had received or in the future could receive financial benefits from Redstone that could taint his independent view of the executive compensation package at issue. Second, seven years elapsed between the

17

filing of the In re: Viacom complaint in 2005 and the filing of Freedman's complaint in this case in 2012. Because "[i]ndependence is a fact-specific inquiry made in the context of a particular case," Beam, 845 A.2d at 1049, as well as at a particular time, it would be inappropriate to adopt Freedman's suggestion that we assume that the relationship between Redstone and Greenberg has remained static for seven years. See Restatement (Second) of Judgments § 27 (cmt. c) (noting that, in some cases, "the separation in time and other factors negat[e] any similarity [so] that the first judgment may properly be given no effect").

Rather, as appellees point out, In re: Viacom relied on Greenberg's involvement through a firm with which he was associated, Bear Stearns, in specific transactions involving Viacom and Redstone personally in the 1990s and early 2000s. But by 2012, Bear Stearns no longer existed, and Greenberg had become a non-executive officer at JPMorgan Chase, the firm that acquired Bear Stearns. JPMorgan Chase's business dealings with Viacom are limited, and there are no allegations in the complaint that Greenberg has been involved in any specific transactions with Redstone or Viacom, or that he continues to be Redstone's investment banker. See Appellees' br. at 24; A. 83 (2012 Proxy Statement) (explaining Greenberg's role at JPMorgan and that transactions with Viacom account for less than 1% of JPMorgan's revenues). The complaint does not contain any specific allegations suggesting that Redstone and Greenberg continue to have a relationship conveying what the court in In re: Viacom called the "taint of interest."

Indeed, this case is indistinguishable from Bansbach v.

18

Zinn, in which the New York Court of Appeals would not apply collateral estoppel where the party asserting it "merely rel[ied] on the proof they put before the court in" an earlier proceeding, but did "nothing to substantiate their claims" in the current proceeding. 801 N.E.2d at 402. Absent concrete allegations regarding the relationship between Redstone and Greenberg that suggest some financial benefit or control—like those presented in In re: Viacom—Freedman has not carried his burden to show the identity of the issues in the two cases, and thus collateral estoppel does not apply. As collateral estoppel with respect to Greenberg's independence is the only ground on which Freedman challenges the Board's independence, the District Court correctly held that demand was not excused on the basis of the application of that doctrine. See Freedman, 2013 WL 3753426, at *8. We therefore turn to the second prong of the demand futility test.

## 2. Exercise of Valid Business Judgment

Because Freedman failed to prove that the Viacom Board of Directors was not independent, he "must carry the 'heavy burden' of showing that the well-pleaded allegations in the complaint create a reasonable doubt that its decisions were 'the product of a valid exercise of business judgment.'" White v. Panic, 783 A.2d 543, 551 (Del. 2001) (quoting Aronson, 473 A.2d at 814). The business judgment rule protects corporate managers from judicial interference with their informed, good faith business decisions. When considering corporate litigation, courts presume that the business judgment rule applies so that unless a plaintiff presents evidence to the contrary, the court assumes that "the directors of a corporation acted on an

19

informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Levine, 591 A.2d at 207 (internal quotation marks and citation omitted), overruled on other grounds by Brehm, 746 A.2d 244. A plaintiff bears a particularly heavy burden to overcome this presumption where, as here, a majority of independent, non-management directors approved the transaction. Id.; see also Grobow v. Perot, 539 A.2d 180, 190 (Del. 1988) (explaining that plaintiff bears a "heavy burden" to avoid pre-suit demand where majority of independent, disinterested directors approved transaction), overruled on other grounds by Brehm, 746 A.2d 244. The business judgment rule protects an independent board's compensation decisions, even those approving large compensation packages. See Brehm, 746 A.2d at 262 n.56; Grimes v. Donald, 673 A.2d 1207, 1215 (Del. 1996) ("If an independent and informed board, acting in good faith, determines that the services of a particular individual warrant large amounts of money . . . the board has made a business judgment.").

Freedman argues that the Compensation Committee's actions fall outside the protection of the business judgment rule because its actions violated the terms of the 2007 Plan. Specifically, Freedman contends that the Committee used subjective factors to calculate the short-term compensation awards, thereby contravening the express terms of the 2007 Plan and rendering the excess compensation not tax deductible. Freedman correctly notes that in certain circumstances transactions that violate stockholder-approved plans may not be protected by the business judgment rule and thus the presence of those circumstances may excuse a plaintiff's failure to make

20

demand on the board.  See, e.g., Ryan v. Gifford, 918 A.2d 341, 354 (Del. Ch. 2006) ("A board's knowing and intentional decision to exceed the shareholders' grant of express (but limited) authority raises doubt regarding whether such decision is a valid exercise of business judgment and is sufficient to excuse a failure to make demand."); see also Weiss v. Swanson, 948 A.2d 433, 441 (Del. Ch. 2008) (explaining that business judgment rule attaches only where board's grant of stock options adheres to stockholder-approved plan).

Key to these cases, however—and missing from Freedman's complaint—are particularized allegations regarding violations of a stockholder-approved plan.  In Ryan, for example, the plaintiff provided "specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures."  918 A.2d at 355.  Freedman's allegations, by contrast, do not provide "sufficient particularity" to survive a motion to dismiss.  See Ryan, 918 A.2d at 355.

The 2007 Plan directed the Compensation Committee to establish performance targets from a list of objective measures, and, if those targets were met, authorized the Committee to award the maximum amount—the lesser of $51.2 million or eight times the executive's base salary.  The 2007 Plan authorized the Committee "in its sole discretion, [to] reduce the amount of any Award to reflect the Committee's assessment of the [executive's] individual performance or for any other reason."  A. 64.  Because the objective performance targets were met in all of the years at issue, the Committee was authorized to

21

award the maximum amount provided in the Plan (the lesser of $51.2 million or eight times base salary), or to adjust this amount downward and award less. According to both the 2012 Proxy Statement and appellees, the Committee did use subjective factors in determining each executive's compensation, but only to adjust the award <u>downward</u>, which both the 2007 Plan and 26 U.S.C. § 162(m) permitted.

Freedman argues that the Committee used subjective discretion to adjust the awards <u>upward</u>, and that we should discard any claim that appellees make to the contrary because the basis for appellees' claim "comes only from [their] briefs." Appellant's br. at 25. Freedman is mistaken. According to the plain terms of the 2007 Plan, the only limitations on short-term executive compensation are that (1) it only may be awarded based on objective performance targets established by the Compensation Committee; (2) if the target is not met, compensation may not be awarded; and (3) if the target is met, the award may not exceed the maximum authorized amounts. The allegations in the complaint do not suggest that any of these provisions were violated, and the 2012 proxy statement supports appellees' position that the Compensation Committee followed the terms of the Plan in awarding short-term compensation.

Moreover, to the extent that the Compensation Committee did use subjective factors to calculate the amount of executive compensation awarded, Freedman has failed to explain why the Committee is not entitled to the protection of the business judgment rule. As discussed above, the 2007 Plan authorizes the Committee to use subjective factors in calculating compensation. In general, "a board's decision on executive

22

compensation is entitled to great deference," and "the size and structure of executive compensation are inherently matters of judgment." Brehm, 746 A.2d at 263. And the Delaware Supreme Court has held that a board does not have the duty to preserve tax deductibility under § 162(m) when awarding executive compensation. See Freedman v. Adams, 58 A.3d 414, 417 (Del. 2013) ("The decision to sacrifice some tax savings in order to retain flexibility in compensation decisions is a classic exercise of business judgment.").

Although Freedman may disagree with the Board's decision to award Viacom's executives substantial short-term incentive compensation, the Board, acting through the Compensation Committee, did not exceed its powers under Delaware law, and we may not second guess its exercise of its business judgment in this matter. Freedman was obligated to make a pre-suit demand. Because he failed to do so, the District Court properly dismissed his derivative claim under Rule 23.1.

B.      Freedman's Direct Claim

Freedman also alleged that the vote to approve the 2012 Plan was invalid because it did not include Class B shareholders. According to Freedman, 26 U.S.C. § 162(m) gives all stockholders a "binding vote" on performance-based incentive compensation plans. Appellant's reply br. at 11. He asserts that Viacom violated this provision by failing to include all shareholders in the vote on the 2012 Plan. We find Freedman's argument to be without merit: § 162(m) does not create shareholder voting rights, nor does it preempt long-established Delaware corporate law allowing corporations to issue non-

23

voting shares.  Freedman purchased only non-voting shares; he cannot now use federal tax law as a backdoor through which he may pass to obtain rights that as a shareholder he does not possess.

First, and most fundamentally, 26 U.S.C. § 162(m) does not provide any voting rights to stockholders.  The provision is one subsection of a tax code provision listing the items that a taxpayer may deduct as business expenses but specifying that certain employee compensation exceeding $1 million is not tax deductible.  This restriction on deductibility does not apply to qualified performance-based compensation, where "the material terms under which the remuneration is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote."  26 U.S.C. § 162(m)(4)(C)(i)-(ii); see also 26 C.F.R. § 1.162-27(e)(4)(i).  Contrary to Freedman's assertions, § 162(m) does not mention voting rights or the mechanics of shareholder voting, or include any language that even hints that Congress intended to require that a corporation provide for voting rights of any kind.  Given this fact, Freedman has an uphill climb to show that Congress intended both to require that corporations grant shareholders certain voting rights, and to do so by displacing Delaware corporate law.

Delaware law presents an obstacle to Freedman's attempt to obtain a judicial result that non-voting shares be allowed to vote.  Delaware law expressly grants corporations the right to issue stock with limitations, including limitations on voting rights.  See Del. Stat. Ann. tit. 8 § 151(a) ("Every corporation may issue 1 or more classes of stock . . . which . . . may have

24

such voting powers, full or limited, or no voting powers . . . ."); see also Lehrman v. Cohen, 222 A.2d 800, 806-07 (Del. 1966) (explaining that § 151(a) permits flexibility in stockholders' rights, and confers express authority to issue non-voting stock). In a provision consistent with this authority, Viacom's certificate of incorporation provides for two types of shares, Class A and Class B.  Each share of Class A stock is entitled to one vote, but the holders of Class B stock are not "entitled to any votes upon any questions presented to stockholders."  A. 156.  Therefore, Viacom was exercising its authority under Delaware law when it issued non-voting shares and, as a consequence, excluded the shareholders holding those shares from voting on the 2012 Plan.

Freedman argues that federal tax law preempts Delaware law with respect to corporate votes but federal law does no such thing.  There are, broadly speaking, three types of preemption: express preemption, field preemption, and implied conflict preemption.  Hillsborough Cnty., Fla., v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 2375 (1985). The Supreme Court directs us to two "cornerstones" in our preemption analysis: first, "the purpose of Congress is the ultimate touchstone in every preemption case," and, second, we must presume that Congress did not intend to preempt state law absent evidence of a "clear and manifest" intention to do so. Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 1194-95 (2009) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 2250 (1996)).  This presumption against preemption is heightened in areas traditionally occupied by the states, such as corporate law, "including the authority to define the voting rights of shareholders."  CTS Corp. v. Dynamics Corp. of Am.,

25

481 U.S. 69, 89, 107 S.Ct. 1637, 1649 (1987); see also Armstrong World Indus., Inc. by Wolfson v. Adams, 961 F.2d 405, 418 (3d Cir. 1992) (acknowledging the "states' prerogative to define shareholder rights"). Given that corporate law is an "area of traditional state regulation," Freedman has a difficult task when he attempts to show preemption absent evidence of Congress's "clear and manifest" intent to supersede state law. See Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449, 125 S.Ct. 1788, 1801 (2005).

As we discussed above, there is nothing in § 162(m)—language, structure, or otherwise—suggesting that Congress intended to confer voting rights on non-voting shares by preempting state corporate law that permitted the issuance of non-voting shares. Indeed, § 162(m) is concerned only with the tax status of various business expenses, and does not implicate corporate structure or governance. Nonetheless, Freedman argues that § 162(m) preempts Delaware law under two separate theories: (1) Congress has occupied the field, and (2) the federal and Delaware laws conflict, making it impossible for a corporation to comply with both. Neither argument has merit.

With respect to his first theory, field preemption, Freedman notes that "the Internal Revenue Code has occupied the field of federal taxation." Appellant's br. at 34. That occupation, however, as expansive as it may be, does not include the field of corporate governance and shareholder rights, matters only tangentially related to tax questions.[8] After all, the

---

[8] We have no need in this opinion to refer to even a small sample of the circumstances in which the application of federal tax law

26

Supreme Court consistently has reiterated that corporate law, including governance and shareholder rights, is a field traditionally left to the states. See, e.g., CTS Corp., 481 U.S. at 89, 107 S.Ct. at 1649; Burks v. Lasker, 441 U.S. 471, 478, 99 S.Ct. 1831, 1837 (1979). Indeed, when we faced a preemption challenge based on the body of federal law most analogous to corporate law—securities laws—we rejected a field preemption argument because not even all the "federal securities laws taken together occupy the field of corporate law." Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 222 n.7 (3d Cir. 2001). We thus cannot find field preemption in this case.

Freedman's second theory, conflict preemption, fares no better. Conflict preemption allows federal law to override state law if it is impossible for a person to comply with both federal and state law, or if "state law erects an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Farina v. Nokia Inc., 625 F.3d 97, 115 (3d Cir. 2010) (quoting Hillsborough Cnty., 471 U.S. at 713, 105 S.Ct. at 2375). Freedman contends that the latter situation applies here: in his view, the purpose of § 162(m) is to enfranchise all shareholders—even those holding non-voting shares—to vote on excess executive compensation, and thus § 162(m) conflicts with Delaware's law granting corporations permission to issue non-voting shares.[9]

_____

depends on rights established by state law.

[9] Freedman thinks this case illustrates the effect of the conflict. Redstone controls the Class A voting shares, and this control

Freedman points to one piece of legislative history to support his argument. The House of Representatives Conference Report discussing the Federal Omnibus Tax Bill explains that compensation exceeding $1 million only can be deducted if the terms of the plan authorizing the compensation were disclosed to shareholders and "approved by a majority of shares voting in a separate vote." H.R. Conf. Rep. No. 103-213, 1993 WL 302291, at *587 (1993). We fail to grasp how this report can be taken as evidence that Congress intended to enfranchise non-voting shareholders as the explanation merely addresses the need for the approval of the "majority of shares voting" to authorize compensation exceeding $1 million but does so without making reference to the shares that can vote. It seems clear that the more natural reading of the congressional report is that the reference to "shares voting" means "voting shares;" it strains credulity to read this report to suggest that Congress intended to displace longstanding state corporate law.[10]

---

guaranteed that the 2012 Plan would be adopted as he favored the plan. Freedman claims this circumstance is at odds with Congress's intent to provide all shareholders with a say over how executive compensation is awarded. Yet if a single shareholder controlled a majority of all of the shares of a corporation and all the shares had equal voting rights, then Congress would have allowed that shareholder to decide the issue individually.

[10] Even if this passage did aid Freedman's case, we would hesitate to rely on legislative history given that the language of §

28

Freedman's other basis to support his claim of conflict preemption is that the regulations associated with other tax provisions, concerning incentive stock options and employee stock purchase plans, expressly mention "voting stock" when discussing shareholder approval. See 26 C.F.R. § 1.422-3(a) ("By a majority of the votes cast at a duly held stockholders' meeting at which a quorum representing a majority of all outstanding voting stock is, either in person or by proxy, present and voting on the plan . . . ."); 26 C.F.R. § 1.423-2(c)(1)(i) (same). Given that Congress thus "understood the difference between 'stock' and 'voting stock,'" appellant's br. at 35, Freedman reads the absence of this language in § 162(m) as an indication that Congress meant for non-voting stockholders to have a vote.

Again, Freedman's argument misses the mark. First, he does not cite the prefatory language to 26 C.F.R. §§ 1.422-3, 1.423-2(c)(1) which provides: "If the applicable State law does not prescribe a method and degree of stockholder approval . . . ." 26 C.F.R. §§ 1.422-3(a), 1.423-2(c)(1). Contrary to Freedman's contentions, these regulations emphasize that Congress did not intend the federal tax code to displace existing state law, and that Congress intended to supplement state law if—and only if—state law had not provided a mechanism for approving a particular plan. Second, it is hard to see how the omission of a particular phrase in implementing regulations indicates a "clear

---

162(m) unambiguously fails to provide the rights that he claims. "Where the statutory language is unambiguous, the court should not consider statutory purpose or legislative history." In re Phila. Newspapers, LLC., 599 F.3d 298, 304 (3d Cir. 2010).

29

and manifest" intent to <u>include</u> something in statutory language. The connection is far too tenuous to overcome the presumption against preemption.

Rather than displaying a "clear and manifest intention" to displace state law, all evidence—the unambiguous statutory language, as well as the legislative history and regulatory language offered by Freedman—indicates that Congress did not intend § 162(m) to confer voting rights on non-voting shareholders or that it even considered that possibility. In our view, as is often the case, the most straightforward way to read legislation is correct: § 162(m) is nothing more than what it purports to be—a statute providing corporations with a mechanism by which certain otherwise excess nondeductible executive compensation over $1 million may become tax deductible. It does not provide voting rights to stockholders holding non-voting shares, it does not override Viacom's certificate of incorporation, and it does not supersede decades of established Delaware law. Accordingly, we do not conclude that Congress has preempted Delaware Corporation law and we therefore hold that the District Court properly dismissed Freedman's direct claim.[11]

---

[11] We note that Freedman does not assert that the Internal Revenue Service did not allow Viacom to deduct all of the compensation it paid to the executives. Though we place only limited significance on this circumstance, the amount of compensation paid the executives was so large that it well may have come to the IRS's attention. <u>See</u> <u>Lexington Nat'l Ins. Corp. v. Ranger Ins. Co.</u>, 326 F.3d 416, 420 (3d Cir. 2003). Yet

## V. CONCLUSION

For the foregoing reasons, we find that the District Court correctly dismissed Freedman's derivative claim because he failed to make a pre-suit demand on Viacom's Board of Directors, and properly dismissed Freedman's direct claim as his complaint did not state a cause of action. We thus will affirm the District Court's order of July 16, 2013.

---

so far as we are aware, the IRS did not challenge the compensation's deductibility.