**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MAUREEN MARDER,
               *Plaintiff-Appellant,*

v.

JENNIFER LOPEZ; SONY MUSIC
ENTERTAINMENT, INC.; PARAMOUNT
PICTURES CORPORATION,
               *Defendants-Appellees.*

No. 04-55615

D.C. No.
CV-03-08226-TJH

OPINION

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Chief District Judge, Presiding

Argued and Submitted
December 9, 2005—Pasadena, California

Filed June 12, 2006

Before: Harry Pregerson, John T. Noonan, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Pregerson

## COUNSEL

Robert Helfing, Sedgwick, Detert, Moran & Arnold, Los Angeles, California, for the plaintiff-appellant.

David E. Fink, (argued) White, O'Connor, Curry & Avanzado, Los Angeles, California; Dale M. Cendali, (argued) and Paula E. Ambrosini (briefed) O'Melveny & Myers, New York, New York, for the defendants-appellees.

## OPINION

PREGERSON, Circuit Judge:

Plaintiff Maureen Marder appeals the dismissal of her claims against Defendants Jennifer Lopez, Paramount Pictures Corporation ("Paramount"), and Sony Music Entertainment, Inc. ("Sony") (collectively, "Defendants"). We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6).

## I.   Factual and Procedural Background

The movie *Flashdance*, released in 1983, tells the story of a woman construction worker from Pittsburgh, Pennsylvania who performs at night as an exotic dancer.[1] She performs an innovative form of dancing that includes a "chair dance," during which she douses herself with water. Her goal is to obtain formal dance training at a university.

*Flashdance* brought in over $150 million in domestic box office receipts for Paramount. The film has remained popular since its release and it continues to be shown on television and distributed through video sales and rentals.

According to Marder, the *Flashdance* story was modeled after her life story and career as a nightclub dancer. She claims that she contributed to the creation of *Flashdance* by providing Paramount with details of her life story with the understanding that Paramount would use this information to create an original screenplay. Marder also claims that she conferred with writer Joe Eszterhas in creating the screenplay.

On December 6, 1982, Marder signed a "General Release" ("Release")[2] purporting to discharge Paramount, its subsidiaries, and its executives from claims arising out of the creation of the film. The Release also granted Paramount the right to use Marder's life story to create *Flashdance*. As consideration, Marder received $2300.

In February 2003, Sony released a music video for the Lopez song, "I'm Glad" ("the Video"). The Video featured

---

[1]The following facts are primarily taken from Marder's complaint. We consider these facts to be true when reviewing a Rule 12(b)(6) motion to dismiss. *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).

[2]We have reproduced the Release in its entirety as an appendix to this opinion.

Lopez's performance as a dancer and singer. According to Marder, the Video contains re-creations of many well-known scenes from *Flashdance*. The complaint alleges that Paramount received money "or other consideration from the licensing or other exploitation of the copyrights in the motion picture, *Flashdance*."[3]

Marder filed a complaint with the district court on November 12, 2003. She asserted a claim against Paramount for a declaration of her rights as a co-author of *Flashdance* and a co-owner of the copyright. She also claimed she was entitled to share in the revenues Paramount allegedly received from Sony for the licensing and exploitation of *Flashdance* in the Video. Finally, she asserted claims against Sony and Lopez based on the Lanham Act, the Copyright Act, and the state law right of publicity and unfair competition.

Defendants filed motions to dismiss Marder's complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted Defendants' motions to dismiss without opinion. Marder appealed.

## II.  Standard of Review

A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed *de novo. See Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004). We must determine whether, "assuming all facts and inferences in favor of the nonmoving party, it appears beyond doubt that [Marder] can prove no set of facts to sup-

___

[3]Apparently, Sony and Lopez initially released the Video without first obtaining permission from Paramount. Paramount gave its permission only after it sent Sony a presumably threatening "legal notice." *See* Josh Greenberg, *J.Lo's Flashdancing Fiasco*, E! Online, May 7, 2003, *available at* http://www.eonline.com/News/Items/0,1,11740,00.html. To our knowledge, no lawsuit was ever filed by Paramount against Sony or Lopez for using elements of *Flashdance* in the Video.

port [her] claims." *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1130 (9th Cir. 2003).

Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003). A court may consider evidence on which the complaint "necessarily relies" if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion. *See Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also Warren*, 328 F.3d at 1141 n.5, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 n.3 (2d Cir. 2002). The court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

In this case, we may consider the Release Marder signed on December 6, 1982. Paragraph 15 of her complaint states: "Ms. Marder provided only a release of claims against Paramount and various individuals for conduct occurring prior to December 6, 1982." The Release is central to her claim and all parties agree that it is appropriate for consideration.

It is not proper, however, for us to consider the letter submitted by Sony purporting to confirm an agreement between Sony and Paramount permitting Sony's use of elements of *Flashdance* in the Video.[4] That letter was created after

---

[4]The letter, dated January 8, 2004, states in relevant part:

This is to confirm the prior oral agreement between Paramount . . . and Sony . . . which provided that Paramount granted Sony permission to use elements from Paramount's film FLASH-DANCE in the music video entitled "I'M GLAD" featuring Jennifer Lopez.

Marder's complaint was filed, and therefore could not possibly have been a document upon which her complaint "necessarily relie[d]." Paragraphs 20 and 53 of Marder's complaint, however, reference the existence of a "licensing" agreement between Paramount and Sony. Therefore, to the extent the existence of an agreement, oral or written, is alleged in Marder's complaint, we will consider such an agreement. We will not, however, consider the contents of the letter itself.

## III. The General Release Precludes Marder From Asserting a Copyright Interest in *Flashdance*

[1] Both Paramount and Marder agree that California law applies to the interpretation of the Release, as provided by the Release terms. According to the California Supreme Court, a release is the "abandonment, relinquishment or giving up of a right or claim to the person against whom it might have been demanded or enforced . . . and its effect is to extinguish the cause of action." *Pellett v. Sonotone Corp.*, 160 P.2d 783, 787 (Cal. 1945); *see also* Cal. Civ. Code § 1541. "In general, a written release extinguishes any obligation covered by the release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence." *Skrbina v. Fleming Cos.*, 53 Cal. Rptr. 2d 481, 489 (Ct. App. 1996).

[2] The interpretation of a release is governed by the same principles applicable to any other contractual agreement. *See Benedek v. PLC Santa Monica, LLC*, 129 Cal. Rptr. 2d 197, 201 (Ct. App. 2002). The court must interpret the Release so

---

As part of that agreement, Paramount committed not to sue Sony regarding such use in return for the lump sum payment previously agreed to orally. It is the parties' intent that this confirming letter will be superseded by a long form agreement. Until such agreement is finalized, the parties will continue to rely on the oral agreement confirmed by this letter.

as to give effect to the parties' mutual intent as it existed when they contracted. *See* Cal. Civ. Code § 1636; *Bank of the W. v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992). The parties' intent should be inferred from the language of the Release, so long as that language is not ambiguous or uncertain. *See* Cal. Civ. Code §§ 1638, 1639.

The Release, executed on December 6, 1982, provides that Marder "releases and discharges Paramount Pictures Corporation . . . of and from each and every claim, demand, debt, liability, cost and expense of any kind or character which have arisen or are based in whole or in part on any matters occurring at any time prior to the date of this Release." The Release also states that "[w]ithout limiting the generality of the foregoing Release," Marder also releases Paramount from claims "arising out of or in any way connected with, either directly or indirectly, any and all arrangements . . . in connection with the preparation of screenplay material and the production, filming and exploitation of . . . *Flashdance*."

**[3]** The Release's language is exceptionally broad and we hold that it is fatal to each of Marder's claims against Paramount. Such a release of "each and every claim" covers all claims within the scope of the language, absent extrinsic evidence to the contrary. *Jefferson v. Cal. Dep't. of Youth Auth.*, 48 P.3d 423, 426-27 (Cal. 2002). As described in greater detail below, Marder has offered no such extrinsic evidence. Accordingly, "the law imputes to [Marder] an intention corresponding to the reasonable meaning of [her] words and acts." *Id.* (quoting *Edwards v. Comstock Ins. Co.*, 252 Cal.Rptr. 807, 810 (1988)). Here, Marder released a broad array of claims relating to any assistance she provided during the creation of a Hollywood movie. Thus, the only reasonable interpretation of the Release is that it encompasses the various copyright claims she asserts in the instant suit.

**[4]** Furthermore, though in hindsight the agreement appears to be unfair to Marder — she only received $2300 in

exchange for a release of all claims relating to a movie that grossed over $150 million — there is simply no evidence that her consent was obtained by fraud, deception, misrepresentation, duress, or undue influence. Indeed, when she signed the Release, Marder was represented by counsel. She has not asserted that her counsel in 1983 was incompetent or deficient in any way. Accordingly, we hold that enforcing the Release by dismissing the claims against Paramount would not "defeat the reasonable expectations of the parties to the contract." *Paralift, Inc. v. Superior Court*, 29 Cal. Rptr. 2d 177, 181 (Ct. App. 1993).

Despite the breadth of the Release, Marder maintains that it does not preclude her causes of action against Paramount because she retained co-ownership and co-authorship rights even after she and Paramount executed the Release. First, she claims that the section of the Release relating to "any matters" occurring prior to the date of the Release only applies to "actionable conduct" occurring before the Release. Second, she claims that the Release's reference to "arrangements . . . in connection with the preparation of *Flashdance*" does not include her contributions to the writing of the film's screenplay. Third, she contends that Paramount's interpretation of the agreement is impermissibly redundant because that interpretation reads the Release to simultaneously grant Paramount the right to use Marder's life story while releasing Paramount from any related claims. Finally, Marder claims that Paramount's actions after the Release's execution support her belief that she retained rights after the date of the Release.

## A.   "Any Matters"

Marder recognizes that the Release absolves Paramount from claims based "in whole or in part upon any matters occurring at any time prior to the date of the release." In its motion to dismiss, Paramount stated that this clause encompasses the current copyright claims brought by Marder in connection with *Flashdance*. Marder contends, however, that the

word "matters" is ambiguous, and that it could reasonably be interpreted more narrowly than Paramount construes it. Marder makes two arguments in support of her claim.

First, she says that the Release does not expressly refer to her status as a co-owner of the copyright or to her alleged writing contributions. She notes, additionally, that the Release does not explicitly mention copyright claims at all. Therefore, she claims that the Release does not preclude her from asserting a co-ownership or copyright interest in the work.

**[5]** This argument contravenes the plain language of the Release, which states that Marder released Paramount from "each and every claim . . . of any kind or character." As stated above, Marder knew that she was releasing her rights related to the creation of a movie at the time she signed the Release. Thus, it is reasonable to infer that when Marder signed the agreement, she knew or should have known that copyright claims "would fall within the scope of that broad language." *Jefferson*, 48 P.3d at 427.

Second, Marder claims that the word "matters" is susceptible to a narrower interpretation as "actionable conduct." According to Marder, the "actionable conduct" here was the alleged infringement by Sony and Lopez in 2003, which occurred long after the date of execution of the Release. Therefore, Marder alleges that her claims are not precluded because the Release only applies to "matters" occurring "prior to the date of [the] Release."

**[6]** Admittedly, the word "matter" has a specialized legal definition: "A subject under consideration, [especially] involving a dispute or litigation; case." Black's Law Dictionary 992 (7th ed. 1999). But courts should interpret the words of a contract in their "ordinary and popular sense, *rather than according to their strict legal meaning*," unless the parties attach a special or technical meaning. Cal. Civ. Code § 1644 (emphasis added). As Paramount points out, the common def-

inition of the word "matters" also includes the "events or circumstances of a particular situation." Webster's Ninth New Collegiate Dictionary 733 (9th ed. 1991).

**[7]** We read the Release to suggest that the parties did not intend "matters" to be interpreted in a strictly legal sense. The Release actually encourages a broad reading of "matters," because it encompasses claims that "are *based in whole or in part* upon *any* matters occurring" prior to the date of the Release. Marder's present copyright claims are rooted in the contributions she made to the screenplay before the execution of the Release. Thus, her claims are based at least "in part" on "matters" that occurred prior to the date of the Release.[5]

## B. "Any and All Arrangements"

Next, Marder claims that the release of any claims relating to "any and all arrangements" does not apply to claims relating to her alleged writing contributions. The language at issue immediately follows the release of claims related to "any matters" discussed above, and states, in relevant part:

> *Without limiting the generality of the foregoing Release*, Marder hereby releases and discharges [Paramount] from each and every claim . . . heretofore or hereafter arising out of or in any way con-

---

[5]Marder states that, hypothetically, a broad interpretation of "matters" would preclude her from bringing suit if Paramount defamed her dance routine. Paramount counters that the intent of the Release is to protect Paramount against claims with some nexus to Marder's contributions to *Flashdance*. California contract law states: "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." Cal. Civ. Code § 1648. Marder's claims to co-ownership, based in her contributions to the creation of the film, fall within the language of the Release. Her hypothetical is unpersuasive because a defamation claim would be based on events entirely unrelated to the creation of the movie. Such a claim would lack a sufficient nexus to the "matters" contemplated by the Release.

> nected with, either directly or indirectly, *any and all arrangements* (including but not limited to research, interviews, costumes, photographic sessions, assistance, services and technical advice of any kind) in connection with the preparation of screenplay material and the production, filming and exploitation of the motion picture tentatively entitled "Flashdance"
> . . . .

(emphasis added). Marder states that this portion of the Release only applies to a specific set of "ancillary services" that she provided during the movie's creation, including arranging interviews and photo shoots with other dancers. According to Marder, those services did not include any of her writing contributions to the screenplays. Therefore, she alleges that the release of claims relating to "arrangements" cannot include any claims in the instant suit, which are based solely on her writing contributions.

**[8]** Marder's reading of the release relating to "arrangements" is strained. Here, "arrangements" is followed by an explanatory parenthetical that lists *examples* of services Marder might have performed, "including but not limited to research, interviews, costumes, photographic sessions, assistance, services and technical advice of any kind." Marder released Paramount from claims relating to services *including but not limited to* those listed in the parenthetical. Thus, we believe that any "writing contributions" she made in connection with the screenplay were included in the category of "arrangements." More importantly, the language of the Release states that Paramount is released from "any and all arrangements . . . *in connection with the preparation of screenplay material.*" (emphasis added). A plain construction of "preparation of screenplay material" necessarily includes any of Marder's alleged writing contributions to the screenplay. We therefore hold that the release of claims relating to "any and

all arrangements" necessarily includes Marder's writing contri-butions.**⁶**

## C.  Whether Release of Claims and Grant of Rights is Redundant

Paramount construes the language of the Release to pre-clude all of Marder's claims against Paramount while simulta-neously granting Paramount the right to use Marder's life story in *Flashdance*. Marder contends that this construction of the Release is untenable because if the agreement truly released Paramount from all claims by Marder, it would be redundant for Paramount to secure a specific grant of rights to use her life story. In support of her claim, she quotes the general proposition that a contract "must be interpreted as a whole, with each clause aiding the interpretation in the attempt to give purpose to every part, and the interpretation should, where possible, give effect to every part so that no clause is redundant." *Super 7 Motel Assocs. v. Wang*, 20 Cal. Rptr. 2d 193, 197 (Ct. App. 1993). Thus, according to Marder, we should not construe the Release to permit such a redundancy.

[9] Marder's contention on this point also lacks merit. It is not impermissibly redundant to secure a waiver of claims and a grant of rights in the same document. As Paramount points out, it is generally recommended that a party seeking to acquire life story rights for use in a motion picture include both clauses in such an agreement. *See* Jay S. Kenoff, 1-5 Entm't Indus. Contracts Form 5-1 ¶¶ 1-2 (Donald C. Farber

---

**⁶**Even if her writing contributions were not covered by "arrangements," the instant claim would be precluded by the release relating to "any mat-ters," discussed above. At oral argument, Marder conceded that her writ-ing contributions occurred before she signed the Release, stating: "Her ownership is based on her having created the screenplay, which did occur prior to the execution of the Release." Thus, her alleged writing contribu-tions were certainly "matters occurring at any time prior to the date of [the] Release."

ed., Matthew Bender & Co., Inc. 2004). Furthermore, a release from claims and a grant of rights together are not redundant. A release extinguishes claims against the released party. *See Skrbina*, 53 Cal. Rptr. 2d at 489. By contrast, a grant is an agreement that creates a right. *See* Black's Law Dictionary 707 (7th ed. 1999). Parties may include both provisions in a contract without undermining the effect of either the grant or the release.

**[10]** Here, Paramount secured a release from claims relating to Marder's involvement with the creation of *Flashdance*. By the same document, Marder granted Paramount the right to use her life story in connection with *Flashdance*. These two clauses do not negate each other and each may be considered without concern for impermissible redundancy.

## D.  Post-Execution Conduct

Marder claims that after the Release was executed, Paramount approached her seeking her permission to make a sequel to *Flashdance*. Marder asserts that Paramount's request for sequel rights reveals Paramount's belief that Marder retained ownership rights after the execution of the Release.

The Ninth Circuit has recognized California contract law's "permissive approach to extrinsic evidence in contract interpretation." *Barris Indus., Inc. v. Worldvision Enters., Inc.*, 875 F.2d 1446, 1450 (9th Cir. 1989). The test for "admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the contract is reasonably susceptible." *Id.* (quoting *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 664 (Cal. 1968)). However, "if the extrinsic evidence advances an interpretation to which the contract is

not reasonably susceptible, the extrinsic evidence is not admissible." *Id*.

**[11]** Our interpretation of the Release is not affected by Marder's allegations that Paramount approached Marder regarding a sequel to *Flashdance*. The Release only relates to *Flashdance*, and various "matters" and "arrangements" concerning that movie. It may be true that Marder retained some undefined rights after the Release, but that does not change the fact that the Release waived "all" and "any" of her claims relating to *Flashdance*. That Paramount considered creating a sequel that was never made does not change the effect of the Release with respect to claims based on the movie that *was* made, *Flashdance*.

**[12]** In conclusion, the Release bars all of Marder's instant claims against Paramount. Her proposed interpretation of the Release is inconsistent with its terms, because the Release's language broadly encompasses "each and every claim" relating to Marder's contributions to the movie *Flashdance*. Specifically, the Release prevents her from asserting a copyright interest in *Flashdance*. The district court therefore properly dismissed Marder's suit against Paramount.

## IV. Marder Is Barred from Bringing an Infringement Claim Against Sony and Lopez

**[13]** We also affirm the district court's dismissal of claims against Sony and Lopez. "Plaintiffs must satisfy two requirements to present a prima facie case of direct infringement: (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). As we held above, under the terms of the Release, Marder cannot sue Paramount to assert a co-ownership in *Flashdance*. It is therefore impossible for her to establish a prima facie case of copyright

infringement against Sony and Lopez. We find that the district court properly dismissed Marder's suit against Sony and Lopez.

## V.   Conclusion

The General Release Marder signed in 1982 constituted a waiver of all claims against Paramount arising out of her contributions to the film *Flashdance*. Her current claims against Paramount are barred by the Release. Marder's suit against Sony and Lopez was properly dismissed because she cannot bring an infringement action if she cannot assert a valid copyright interest in *Flashdance* and she has no existing evidence of copyright ownership. Because our ruling is dispositive, we need not address the other defenses raised by Defendants. Accordingly, we affirm the district court's grant of Defendants' motions to dismiss under Rule 12(b)(6).

AFFIRMED.

APPENDIX

GENERAL RELEASE

For and in consideration of the sum of Two Thousand Three Hundred Dollars (U.S. $2,300.00) paid to the undersigned, Maureen Marder ("Marder"), receipt of which is hereby acknowledged, Marder hereby releases and discharges Paramount Pictures Corporation, its parent, subsidiary and affiliated companies and their respective past, present and future officers, agents, employees, attorneys, predecessors-in-interest, successors, assigns and licensees and each of them (including without limitation Jerry Bruckheimer, Joe Eszterhas, Tom Hedley, Adrian Lyne, or any companies supplying their respective services, PolyGram Pictures, Ltd. and PolyGram Pictures, Inc.), all of said companies and persons hereinafter for convenience "Releasees", of and from each and every claim, demand, debt, liability, cost and expense of any kind or character which have arisen or are based in whole or in part upon any matters occurring at any time prior to the date of this Release.

Without limiting the generality of the foregoing Release, Marder hereby releases and discharges said Releasees and each of them and all other persons, firms or corporations from each and every claim, debt, demand, liability, cost or expense heretofore or hereafter arising out of or in any way connected with, either directly or indirectly, any and all arrangements (including but not limited to research, interviews, costumes, photographic sessions, assistance, services and technical advice of any kind) in connection with the preparation of screenplay material and the production, filming and exploitation of the motion picture tentatively entitled "FLASH-DANCE", and any version thereof in any media; and in that connection, Marder does hereby specifically grant said Releasees the non-exclusive right to use the aforementioned arrangements, the story of Marder's life and her experiences as a dancer, and such uses may be factual and/or fictional with

the right to make such changes therein and thereto as Releasees in their sole discretion may determine in connection with said motion picture "FLASHDANCE" and the properties upon which it is based and any versions thereof in any media, which motion picture and properties and any versions thereof may be published, exhibited, advertised and exploited by Releasees in all media perpetually throughout the universe, provided Marder's name, i.e., actual surname or her stage name "July August" shall not be used in connection with the said motion picture.

Marder hereby directs that payment of the aforesaid sum of $2,300.00 be made to Enid G. Hildebrand, as her attorney, who is hereby authorized to receive and receipt therefor and the Releasees hereunder shall not be responsible for payment by said attorney to Marder.

Marder hereby waives and relinquishes all rights which she may have under Section 1542 of the California Civil Code which reads as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor."

It is understood by Marder that the facts in respect of which the foregoing release is given may turn out to be other than or different from the facts in that connection known to her or believed by her to be true, and Marder expressly assumes the risk of the facts turning out to be so different and agrees that the foregoing release shall be in all respects effective and not subject to termination or rescission by reason of any such difference in facts.

Marder specifically agrees that she will not at any time divulge to any third party in any way the fact of this General

Release or any details thereof, or the facts relating to her involvement with Tom Hedley. So far as Marder is aware, Gina Healey's involvement with the aforementioned motion picture was minimal.

All references to Marder hereinabove shall be deemed to constitute a reference to her employees, agents, personal representatives, heirs, successors and assigns, and this Release shall be binding upon each and every one of them.

This General Release shall be governed by the laws of the State of California to the same extent as agreements executed and wholly performed in the said State of California.

IN WITNESS WHEREOF, the undersigned has executed this Release this 6th day of December, 1982.

/s/ Maureen Marder

I acknowledge receipt of the $2,300.00 payment to Enid G. Hildebrand as attorney for Maureen Marder.

/s/ Enid G. Hildebrand