**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM; BOILERMAKERS LODGE NO. 154 RETIREMENT FUND; MARYANNE SOLAK; EXCAVATORS UNION LOCAL 731 WELFARE FUND, *Plaintiffs-Appellants*, <br><br> v. <br><br> STEPHEN A. WYNN; LINDA CHEN; RUSSELL GOLDSMITH; RAY R. IRANI; JOHN A. MORAN; ROBERT J. MILLER; MARC D. SCHORR; ALVIN V. SHOEMAKER; D. BOONE WAYSON; ALLAN ZEMAN; ELAINE P. WYNN; WYNN RESORTS LIMITED, *Defendants-Appellees*. | No. 14-15695 <br><br> D.C. No. 2:12-cv-00509-JCM-GWF <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted May 12, 2016
San Francisco, California

Filed July 18, 2016

Before: Jerome Farris, Diarmuid F. O'Scannlain,
and Morgan Christen, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY*

### Shareholder Derivative Lawsuit

The panel affirmed the district court's dismissal under
Fed. R. Civ. P. 23.1 of a shareholder derivative lawsuit
alleging that Wynn Resorts board of director defendants
breached their fiduciary duties.

Addressing jurisdictional issues, the panel held that
diversity jurisdiction under 28 U.S.C. § 1332(a)(2) was
improper because there were American citizens on both sides
of the case. The panel also held that diversity jurisdiction
under 28 U.S.C. § 1332(a)(3) was foiled by one of the
defendants who was a United States citizen, but who was a
permanent resident of Macau and was not domiciled in a
State. The panel concluded that the defendant was a
dispensable party under Fed. R. Civ. P. 19. Under Fed. R.
Civ. P. 21, the panel exercised its discretion to dismiss the
defendant from the suit in order to perfect diversity
jurisdiction. The panel concluded that diversity jurisdiction
was thereby established under § 1332(a)(3).

---

* This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

Before bringing a suit on behalf of the corporation, shareholders are required either to make a demand on the board of directors or to explain why such demand would be futile. The shareholders argued that demand would be futile.

The panel held that the district court did not abuse its discretion in determining that the shareholders failed to comply with Rule 23.1 or state law governing demand futility. Specifically, the panel held that the shareholders did not give sufficiently particularized allegations to support an inference that a majority of the board of directors lacked independence. The panel also rejected the shareholders' theory that demand was excused based on allegations that the directors faced a substantial likelihood of personal liability for any wrongdoing. The panel also rejected the shareholders' argument that demand was futile based on the directors not getting the benefit of the business judgment rule if a questionable stock redemption were challenged in court, because under Nevada law it was not reasonable to assume the board was acting dishonestly.

Finally, the panel held that there was no reversible error if the district court considered materials extraneous to the complaint.

## COUNSEL

Richard A. Speirs (argued) and Christopher Lometti, Cohen Milstein Sellers & Toll PLLC, New York, New York; Daniel S. Sommers, and Elizabeth A. Aniskevich, Cohen Milstein Sellers & Toll PLLC, Washington, D.C.; for Plaintiff-Appellant Excavators Union Local 731 Welfare Fund.

Felipe J. Arroyo (argued), Shane P. Sanders, and Gina Stassi, Robbins Arroyo LLP, San Diego, California, for Plaintiff-Appellant Boilermakers Lodge No. 154 Retirement Fund.

John T. Jasnoch, Scott + Scott Attorneys at Law LLP, San Diego, California, for Plaintiff-Appellant Louisiana Municipal Police Employees' Retirement System.

Geoffrey M. Johnson, Scott + Scott Attorneys at Law LLP, Cleveland Heights, Ohio, for Plaintiff-Appellant Louisiana Municipal Police Employees' Retirement System.

John P. Aldrich, Aldrich Law Firm Ltd, Las Vegas, Nevada, for Plaintiffs-Appellants.

Todd L. Bice (argued), James J. Pisanelli, and Debra L. Spinelli, Pisanelli Bice PLLC, Las Vegas, Nevada; Paul K. Rowe, Bradley R. Wilson, and Grant R. Mainland, Wachtell, Lipton, Rosen & Katz, New York, New York; Robert L. Shapiro, Glaser Weil Fink Howard Avchen & Shapiro LLP, Los Angeles, California; for Defendants-Appellees Linda Chen, Russell Goldsmith, Ray R. Irani, John A. Moran, Robert J. Miller, Marc D. Schorr, Alvin V. Shoemaker, D. Boone Wayson, and Allan Zeman.

John B. Quinn and Michael T. Zeller, Quinn Emanuel Urquhart & Sullivan LLP, Los Angeles, California, for Defendant-Appellee Elaine P. Wynn.

Donald J. Campbell and J. Colby Williams, Campbell & Williams, Las Vegas, Nevada, for Defendant-Appellee Stephen A. Wynn.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether shareholders may pursue a derivative lawsuit against a corporation's board of directors despite their failure to demand that the board initiate this litigation itself.

I

This is a shareholder derivative suit. The plaintiffs are shareholders of Wynn Resorts, Limited ("Wynn Resorts"), a Nevada corporation that owns and operates casinos in Las Vegas and Macau, the latter through its subsidiary, Wynn Macau, Limited. The defendants are Wynn Resorts itself and eleven individuals who sit or sat on its board of directors. The shareholders wish to challenge two actions the board took on behalf of its subsidiary Wynn Macau: a 2011 decision to donate $135 million to the University of Macau Development Foundation, and a 2012 decision to redeem the shares held by a former director named Kazuo Okada, who was the only director to vote against the donation.

We recite the facts as alleged in the shareholders' amended complaint, and we assume them to be true for purposes of this appeal.

A

In 2006 Wynn Resorts opened its first hotel in Macau, China under a lease from the Macau government with a term from 2002–2022. Also in 2006 Wynn Resorts applied to the Macau government for a second lease agreement to build a

new resort and casino. Central to the present dispute is the University of Macau and its Development Foundation, which is presided over by many of the same government officials who have substantial control over gaming matters and the real estate industry in Macau.

Five years after Wynn Resorts submitted its application for a second lease agreement, the Macau government still had not approved it, but in May 2011 the board authorized a donation to the Development Foundation totaling $135 million over a ten year period. Okada was the only director on the eleven-member board to vote against the donation.[1] About a month after the donation, the Macau government accepted Wynn Resorts's application for a second lease.

In February 2012, the U.S. Securities and Exchange Commission ("SEC") launched an informal inquiry into the Macau donation. The shareholders do not allege that the SEC's investigation escalated into a formal enforcement proceeding, and in fact, the shareholders acknowledge that after they filed this suit, the SEC concluded its investigation without taking further action. The Nevada Gaming Commission Board ("GCB") also undertook an investigation into the Macau donation, but the shareholders' complaint acknowledges that the GCB had terminated its investigation, finding no violations of state law, by the time the shareholders brought this suit.

Meanwhile, in October or November 2011, Okada began demanding a separate investigation into the Macau donation.

---

[1] The board at the time consisted of Steve Wynn, Elaine Wynn, Russell Goldsmith, John Moran, Mark D. Schorr, Allan Zeman, Kazuo Okada, Ray Irani, Robert Miller, Alvin Shoemaker, and D. Boone Wayson.

Around the same time, in November 2011, Steve Wynn—the company's Chairman and CEO—hired former FBI director Louis Freeh to investigate allegations that Okada had made improper gifts to gaming regulators in the Phillippines. Freeh concluded that Okada was "unsuitable" to own shares of Wynn Resorts, under Nevada law and the corporation's Articles of Incorporation, and so the corporation forcibly redeemed Okada's $2.77 billion equity stake in the company in exchange for a promisory note worth $1.9 billion. The Okada redemption is the subject of separate lawsuits between Steve Wynn and Okada in Nevada state court.

B

Their eyebrows raised by these decisions, the shareholders decided to sue the Wynn Resorts board. In the shareholders' estimation, the Macau donation was nothing but a *quid pro quo* bribe, and the Okada redemption had no legitimate business purpose but was merely a gambit Steve Wynn used to oust a dissenting director and intimidate the others into complying with his wishes from there on out.

The shareholders filed their derivative action in federal district court in 2012, and after it was dismissed, they amended their complaint in April 2013. At the time the shareholders filed their amended complaint, the Wynn Resorts board of directors had eight members: Steve Wynn, Elaine Wynn, Robert Miller, D. Boone Wayson, J. Edward Virtue, John Hagenbuch, Ray Irani, and Alvin Shoemaker. Four of the defendants who are still parties to the suit—Linda Chen, Russell Goldsmith, John Moran, and Allan Zeman—are former members of the board, and had ceased to be directors by the time the shareholders filed their amended complaint.

The complaint alleges that the director defendants breached their fiduciary duties and committed corporate waste by approving the Macau donation because, the shareholders allege, the donation caused the company to incur legal expenses and be exposed to potential liability. The complaint also alleges that the defendants breached their fiduciary duties by redeeming Okada's shares because, the shareholders allege, such action had no legitimate purpose and merely encumbered the company with a higher debt load.

C

Before bringing their suit on behalf of the corporation, however, the shareholders were required either to make a demand on the board of directors or to explain why such demand would be futile. The shareholders did not make a demand. Instead, they argued that demand would be futile, for three reasons: first, Steve Wynn is "interested"—meaning he cannot be expected to exercise impartial judgment about whether it is in the corporation's best interests to sue the board as the shareholders wish to do—and a majority of the board is alleged to be "beholden" to him and therefore likewise incapable of exercising impartial judgment about whether to sue the board; second, the directors allegedly cannot be impartial because they face a substantial likelihood of incurring personal liability for their decision to approve the Macau donation; and third, the directors allegedly cannot be impartial because there is a reasonable doubt as to whether their decision to redeem Okada's shares would be given the benefit of the business judgment rule if it were challenged in court.

The district court disagreed, and dismissed the amended complaint under Federal Rule of Civil Procedure 23.1. The

district court found Steve Wynn to be interested, but held that the shareholders had not adequately alleged a majority of the board to be "beholden" to him. The district court also held that the shareholders had not sufficiently alleged a substantial likelihood that the directors would incur personal liability for approving the Macau donation. Finally, the district court held that the shareholders had not alleged enough to create a reasonable doubt about whether the Okada redemption would be given the benefit of the business judgment rule if it were challenged in court.

The shareholders timely appealed.

II

Before turning to the merits, we must address two issues with respect to our jurisdiction to hear this case.[2]

This suit arises entirely under state law, with the shareholders bringing state-law causes of action for breach of fiduciary duty and waste of corporate assets, and seeking in response a permanent injunction and restitution for unjust enrichment. The shareholders' complaint alleges federal jurisdiction exclusively under 28 U.S.C. § 1332(a)(2), part of the diversity jurisdiction statute which covers suits between "citizens of a State and citizens or subjects of a foreign state." There are two problems with that jurisdictional pleading.

---

[2] We recognize that our decision in *Potter v. Hughes*, 546 F.3d 1051, 1054–55 (9th Cir. 2008), suggests that where shareholders have failed to comply with Rule 23.1, and their derivative suit is also plagued by an independent jurisdictional defect, we can choose either ground as a basis for dismissing their action. Because in this case we can cure any jurisdictional problems, however, we have no need to rely on *Potter*.

A

First, § 1332(a)(2) is an improper basis because the plaintiffs are alleged to be American citizens, and the defendants are alleged to be a mix of American citizens and foreign citizens. Because there are American citizens on both sides of the case, jurisdiction cannot be grounded in § 1332(a)(2). *See, e.g.*, *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828–29 (1989) (explaining that "[s]ubsection 1332(a)(2), which confers jurisdiction in the District Court when a citizen of a State sues aliens only, . . . could not be satisfied because [one of the defendants] is a United States citizen," and that such defendant's "United States citizenship destroy[s] complete diversity under § 1332(a)(2)"); *Harris v. Rand*, 682 F.3d 846, 848 & n.1 (9th Cir. 2012). Instead of § 1332(a)(2), the shareholders should have invoked § 1332(a)(3), which provides jurisdiction over suits between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." 28 U.S.C. § 1332(a)(3).

This defect could be fixed without difficulty *if* diversity jurisdiction would have been proper under § 1332(a)(3). *See* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."). But that leads us to the second problem.

B

One of the defendants—Linda Chen, a former director of Wynn Resorts—is neither a citizen of a State nor a citizen of a foreign state. Specifically, in response to a sua sponte order by this court, the defendants have filed a declaration by Chen in which she swears that she is a United States citizen but

"do[es] not reside in the United States and ha[s] not been a permanent resident of any state in the United States since approximately 2004." Indeed, Chen swears that by the time the plaintiffs first filed their complaint in August 2012, she had already become "a permanent resident of Macau," a status she claims she still retains.

Chen's declarations establish that she is not domiciled in a State. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) ("For adults, domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there."). She therefore cannot be a citizen of a State for purposes of diversity jurisdiction. *Newman-Green*, 490 U.S. at 828 ("In order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States *and* be domiciled within the State."). Because Chen is "a United States citizen, [but] has no domicile in any State," she is "'stateless' for purposes of § 1332(a)(3)." *Id.* Such "'stateless' status destroy[s] complete diversity under § 1332(a)(3)." *Id.* at 829.

In short, Chen's continued presence in the suit necessarily foils the plaintiffs' attempt to comply with § 1332(a)(3).

C

Fortunately, the jurisdictional defects described above can be remedied without need for a remand. First, even though Chen is a nondiverse party, Rule 21 of the Federal Rules of Civil Procedure gives us discretion to dismiss her from the suit in order to perfect diversity jurisdiction, provided that she is not an indispensable party under Rule 19. *Id.* at 837 (holding that, under Rule 21, "the courts of appeals have the

authority to dismiss a dispensable nondiverse party"); *Sams v. Beech Aircraft Corp.*, 625 F.2d 273, 277 (9th Cir. 1980) ("Rule 21 grants a federal district or appellate court the discretionary power to perfect its diversity jurisdiction by dropping a nondiverse party provided the nondiverse party is not indispensable to the action under Rule 19.").

We have no trouble concluding that Chen is a dispensable party under Rule 19. She was not a member of the Wynn Resorts board when the shareholders filed their amended complaint; nor was she a member of the Wynn Resorts board that approved the Macau donation. The shareholders have not made a single allegation about her during the course of this appeal, and in their supplemental briefing before us, they have not attempted to argue that she is indispensable. Given those circumstances, it is "evident that none of the parties will be harmed by [her] dismissal." *Newman-Green*, 490 U.S. at 838. There is no suggestion that her presence provided the shareholders "with a tactical advantage," *id.*, or that any party would be prejudiced by her dismissal. Because "[n]othing but a waste of time and resources would be engendered by remanding to the District Court or by forcing these parties to begin anew," *id.*, we exercise our discretion to dismiss Chen from the suit without prejudice.

Second, in supplemental filings with our court, the shareholders acknowledged that jurisdiction would be proper under § 1332(a)(3) if we were to dismiss Chen from the case. Because we have decided to do exactly that, we construe the shareholders' supplemental brief as a request to amend their jurisdictional allegation from § 1332(a)(2) to § 1332(a)(3). We grant such motion, dismiss Chen from the suit, and conclude that federal jurisdiction is thereby established under § 1332(a)(3).

## III

"A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir. 1999) (as amended)). Such requirement follows from "the general rule of American law . . . that the board of directors controls a corporation." *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008). The board's control includes and ought to include the decision whether to pursue litigation when the corporation may have suffered harm. Hence, "[a]bsent sufficient reason to doubt the directors' ability to make disinterested and independent decisions about litigation, the board is not only empowered but optimally positioned to make decisions on behalf of the corporation and, if appropriate, pursue litigation." *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 339 (Del. Ch. 2012), *rev'd sub nom. on other grounds Pyott v. La. Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612 (Del. 2013).

The "demand futility rule" is also reflected in the heightened pleading standard set forth in Rule 23.1 of the Federal Rules of Civil Procedure, which requires shareholders who bring derivative suits to "state with particularity (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3).

Because Nevada is Wynn Resorts's state of incorporation, Nevada law governs whether the shareholders have adequately alleged demand futility. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108–09 (1991). Nevada, in turn, looks to Delaware law on shareholder demand futility. *Shoen v. SAC Holding Corp.*, 137 P.3d 1171, 1184 (Nev. 2006). Accordingly, "[w]hen evaluating demand futility, Nevada courts must examine whether particularized facts demonstrate: (1) in those cases in which the directors approved the challenged transactions, a reasonable doubt that the directors were disinterested or that the business judgment rule otherwise protects the challenged decisions; or (2) in those cases in which the challenged transactions did not involve board action or the board of directors has changed since the transactions, a reasonable doubt that the board can impartially consider a demand." *Id.*

The relevant board is the board as it was constituted when the shareholders filed their amended complaint. *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006). As such, the shareholders must allege that at least half of the board, as it was constituted when the shareholders filed the amended complaint, was incapable of entertaining a pre-suit demand. Such board consisted of eight members: S. Wynn, E. Wynn, Miller, Wayson, Virtue, Shoemaker, Hagenbuch, and Irani. The defendants concede for purposes of this appeal that S. Wynn and E. Wynn are not independent. Hence, to plead demand futility, the shareholders must make sufficient allegations that at least two of the remaining six directors lack

independence. The shareholders focus on three: Miller, Wayson, and Virtue.[3]

The shareholders offer three principal theories as to why they believe demand was futile. First, the shareholders maintain that a majority of the board is beholden to Steve Wynn. Second, the shareholders argue that the directors face a substantial likelihood of personal liability for approving the Macau donation. Third, the shareholders argue that there is a reasonable doubt that the directors would get the benefit of the business judgment rule if the Okada redemption were challenged in court.

The district court's determination that the shareholders failed to comply with Rule 23.1 or state law governing demand futility is reviewed for abuse of discretion. *Potter*, 546 F.3d at 1056.[4]

A

To prevail, the shareholders must give sufficiently particularized allegations to support an inference that a majority of the board lacks independence. The shareholders need to pick up at least two of the three non-interested

---

[3] In light of the *Braddock* rule, the shareholders' allegations about Moran are not relevant because Moran was not a member of the board at the time the shareholders filed their amended complaint.

[4] The shareholders acknowledge as much, but argue that the district court's decision should be reviewed de novo. It goes without saying that our panel has no power to reject circuit precedent on our own. In any case, even if there are plausible arguments that de novo review would be more appropriate than review for abuse of discretion in cases like this, we are satisfied that the standard of review makes no difference here.

directors Miller, Wayson, and Virtue. To show a lack of independence, shareholders must allege "facts that show that the majority [of directors] is 'beholden to' directors who . . . [are] unable to consider a demand on its merits." *Shoen*, 137 P.3d at 1183. This test requires the shareholders to "plead facts that would support the inference that because of the nature of a relationship or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1052 (Del. 2004).

Importantly, "the simple fact that there are some financial ties between the interested party and the director is not disqualifying." *In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013). To that end, "a plaintiff seeking to show that a director was not independent must meet a materiality standard, under which the court must conclude that the director in question's material ties to the person whose proposal or actions she is evaluating are sufficiently substantial that she cannot objectively fulfill her fiduciary duties." *Id.* As to materiality, the Delaware Supreme Court "has rejected the suggestion that the correct standard for materiality is a 'reasonable person' standard; rather, it is necessary to look to the financial circumstances of the director in question to determine materiality." *Id.* at 510. The same materiality requirement applies "in the context of personal, rather than financial relationships." *Id.* at 509 n.37. Such non-financial relationships must be "contextually material." *Id.* at 513 n.64.

We consider each of the three relevant directors in turn.

1

The shareholders' complaint alleges the following about Miller: he is a partner in a parent company ("Nevada Rose") of a group of companies that sell rose nectar used at Wynn Resorts in Macau; he is a director of a company ("IGT") that makes casino games used at Wynn Resorts; Steve Wynn helped Miller win reelection as governor of Nevada in 1994 by donating $70,000 to his campaign and by trying (unsuccessfully) to discourage a potential rival from challenging Miller in the primary; in 1997, Miller testified on Steve Wynn's behalf at a libel suit Wynn had brought against the author of an unauthorized biography, and during his testimony Miller described himself as a "23 year old friend of Wynn's"; and finally, Steve Wynn and Wynn Resorts provided campaign contributions to Miller's son when he ran for Nevada secretary of state between 2006 and 2012.

We agree with the district court that these allegations are insufficiently particularized to plead Miller's beholdenness to Steve Wynn. The allegations about Miller's financial ties to Wynn are inadequate because they fail to allege materiality, as they "do[] nothing . . . to compare the actual economic circumstances of [Miller] to the ties [the shareholders] contend affect [his] impartiality." *In re MFW*, 67 A.3d at 510. In other words, like the shareholders in *MFW*, the shareholders here "have ignored a key teaching of [the Delaware] Supreme Court, requiring a showing that a specific director's independence is compromised by factors material to her." *Id.* Similarly, with respect to Wynn's campaign contributions, the shareholders fail to allege the relative importance (that is, the contextual materiality) of Wynn's $70,000 contribution or of the pressure Wynn exerted on one of Miller's potential primary challengers—who never even

heeded Wynn's request, and wound up losing "by a wide margin" anyway. Moreover, the passage of time—nearly 20 years—would seem to dilute whatever materiality such aid might have had in the first place. Miller's decision to testify on Wynn's behalf at a trial in 1997, and Wynn's contributions to Miller's son's campaigns, are too insubstantial and are likewise devoid of allegations as to materiality.

2

The shareholders' complaint alleges the following about Wayson: Wynn's father and Wayson's father operated a bingo hall together in the 1950s; Wayson's brother and sister have worked with Steve Wynn in various capacities over the years; Wayson has worked at Wynn-controlled enterprises for many years and has "received substantial monetary compensation" for doing so; and Wayson has an unspecified "business interest in Wynn-related gaming activity in Pennsylvania."

As with Miller, we conclude that the complaint's allegations about Wayson are not enough to plead a lack of independence. Again, any financial or economic ties are not alleged to be material. Nor do the social ties support an inference that Wayson and Wynn are "as thick as blood relations," *In re MFW*, 67 A.3d at 509 n.37, or that Wayson's relationship with Wynn is otherwise material to him in any way. Taken together, we do not see how the allegations with regard to Wayson cast his impartiality into doubt. It certainly was not an abuse of discretion for the district court to conclude that they do not.

3

Finally, the shareholders' complaint alleges the following about Virtue: that when he joined the Wynn Resorts board, he received a nearly $1 million ownership stake, which was given to him partly to compensate him for having to close accounts he had previously managed at a private equity firm called MidOcean Partners; and in the late 1990s and early 2000s, Virtue worked at Deutsche Bank, and Deutsche Bank provided financing to Steve Wynn for various ventures.

These allegations strike us as the weakest of all. The complaint has no allegations as to the materiality of Virtue's $1 million stock options, and in any event the inference would seem to cut against the shareholders, insofar as Virtue's interest in the financial health of Wynn Resorts would incline him to pursue *its* interests rather than subordinate them to Steve Wynn's personal interests. Likewise, the allegations of vague and impersonal business relationships more than a decade and a half ago are too insubstantial to call into question Virtue's independence. *See Beam*, 845 A.2d at 1051 ("Allegations that [the controller] and the other directors . . . developed business relationships before joining the board . . . are insufficient, without more, to rebut the presumption of independence.").

4

Finally, the shareholders' complaint advances a generalized theory that Steve Wynn dominates the entire board because, the complaint alleges, "each member of the Board has been hand-picked by Stephen Wynn, is virtually guaranteed election to the Board by virtue of the voting agreement and, therefore, is beholden to Stephen Wynn for

his or her nomination and selection to the Board and will not take action against him." The complaint also alleges that Wynn caused Okada to be ousted from the Board after Okada opposed the Macau donation. In their brief, the shareholders argue that such allegations support "the reasonable inference that S. Wynn would, and could, remove any directors who oppose him," and they argue that the district court erred in failing to draw such inference.

These allegations are inadequate to show a lack of independence. First, the complaint acknowledges that Wynn in fact lacked the unilateral power to remove Okada; and second, the complaint acknowledges that the board had objective, independent evidence of Okada's potentially illegal activities unrelated to the Macau donation, which served as the basis for his share redemption. What remains of the shareholders' broad-based domination theory is simply too speculative and insufficiently particularized to satisfy the heightened pleading requirements of Rule 23.1.[5]

---

[5] We reject the shareholders' argument that the district court committed reversible error by failing to identify the correct legal standard. The district court's formulation of the legal standard is entirely consistent with the governing law that "mere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence." *In re MFW*, 67 A.3d at 509. Moreover, the district court's subsequent analysis makes clear that it did not labor under the mistaken premise that *any* social or business relationship, no matter how close, would be insufficient to disqualify a director. Finally, the shareholders repeatedly assert that the district court erred by considering the complaint's allegations separately rather than in combination. We disagree. As explained in more detail above, the allegations leveled at each director fail individually and collectively. The district court's analysis was not unduly piecemeal.

B

In addition to arguing that demand was futile because a majority of the board is beholden to Steve Wynn, the shareholders argue that demand was futile because the directors face a substantial likelihood of personal liability for approving the Macau donation, which, they allege, "caused Wynn Resorts to pursue profit at the expense of complying with the law." The parties agree that director liability under such circumstances would require "intentional misconduct, fraud or a knowing violation of law" on the part of the directors. Nev. Rev. Stat. § 78.138(7)(b). The complaint acknowledges that Steve Wynn had obtained a legal opinion blessing the donation, but alleges that the directors did not request to see the opinion before the vote.

In addition, the shareholders allege more generally that "Macau has been plagued by political corruption and organized crime," and "the Wynn Resorts board was well aware of [this] corrupt environment"; that the directors had received FCPA training; and that the directors knew that some of the people who would benefit from the Macau donation were the same people who were in a position to influence Wynn's access to gaming licenses in Macau.

We agree with the district court that the above allegations are not sufficient to show that the directors face a substantial likelihood of personal liability for any wrongdoing. Most importantly, even assuming that the Macau donation did in fact violate the FCPA, the allegations do not create a reasonable inference that any of the individual directors intended or knew that it would do so, as Nevada law would require. Indeed, the complaint's principal allegation is that the defendants "voted in favor of the donation to the

Foundation without any evidence that this donation was compliant with the law and the Company's policies." Even if the complaint can be read to allege with particularity that the directors were negligent with respect to the Macau donation's legality, such would not be sufficient to establish a substantial likelihood of director liability, because Nevada law requires knowledge or intent before director liability attaches. And the fact that the complaint acknowledges that the Nevada state investigation terminated without any enforcement proceedings severely undermines the shareholders' speculation that the directors face a substantial likelihood of liability. We therefore reject the shareholders' theory that demand is excused based on allegations that the directors face a substantial likelihood of liability for approving the Macau donation.

C

The shareholders' final theory is that demand is futile because there is a reasonable doubt that the directors will be entitled to the business judgment rule if the Okada redemption is challenged in court.

Nevada law provides that "[d]irectors and officers, in deciding upon matters of business, are presumed to act in good faith, on an informed basis and with a view to the interests of the corporation." Nev. Rev. Stat. § 78.138(3). To overcome such presumption, the shareholders "must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003); *see also Shoen*,

137 P.3d at 1181 (citing Delaware law to define content of Nevada business judgment rule).

In their attempt to overcome the business judgment rule's presumption, the shareholders rely on their allegation that the Okada redemption was in bad faith because the decision to convert Okada from an equity holder to a debt holder could not have done anything to protect the company's gaming license if indeed Okada was an "unsuitable" shareholder. "[B]ecause the redemption could not have protected the Company's gaming licenses," the shareholders contend, "the redemption had no legitimate business purpose and is not protected by the business judgment rule."

The reason this allegation fails is that Nevada law *does* treat equity holders and debt holders differently, and in a way that leaves the corporation's gaming license more secure if a potentially unsuitable security-holder has debt rather than equity. *Compare* Nev. Rev. Stat. § 463.643(4) ("Each person who . . . acquires . . . more than 10 percent of any class of voting securities of a publicly traded corporation registered with the Commission . . . *shall* apply to the Commission for a finding of suitability . . . .") (emphasis added), *with* Nev. Rev. Stat. § 463.643(2) ("Each person who acquires . . . any debt security in a publicly traded corporation which is registered with the Commission *may be* required to be found suitable . . . .") (emphasis added). As a consequence, it does not follow logically, and it is not reasonable to infer, that the board was acting dishonestly, in bad faith, or without an informed basis—or otherwise had no legitimate business purpose—when it voted to convert Okada's shares from equity to debt in response to the report of former FBI director Freeh.

IV

Finally, the shareholders argue that the district court should be reversed because, they claim, it illicitly considered materials extraneous to the complaint. The shareholders specify two such materials: a Wynn Proxy Statement the district court allegedly relied on in rejecting the shareholders' theory that director J. Edward Virtue is beholden to Steve Wynn; and an SEC filing (a Form 8-K) which the district court allegedly relied on in rejecting the shareholders' theory that the directors face a substantial likelihood of personal liability.

The Supreme Court has instructed that courts ruling on a motion to dismiss "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[A] court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (quoting Fed. R. Evid. 201(b)); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

The defendants requested the district court to take judicial notice of several documents, including the Wynn Proxy Statement and the SEC Form 8-K, but the district court declined to do so, reasoning that the requested documents "all contain information that contradict key elements of plaintiffs' claims in this case." Nevertheless, the shareholders object that the district court's subsequent analysis drew on the substance of those very same documents.

A

The shareholders may well be correct that when the district court discussed Virtue's independence, it may have had in mind the Proxy Statement showing that directors other than Virtue received comparable options awards (as in, valued at around $1 million) when they joined the Wynn Resorts board. Nonetheless, we are satisfied that any error on the district court's part was harmless, because the shareholders failed to raise a reasonable doubt as to Virtue's independence in any event. In particular, and as discussed at greater length above, the shareholders made no allegations suggesting that the amount of Virtue's options award was material to him, whether or not such amount was typical of other directors. Furthermore, the district court's discussion of Virtue's independence rested on several different factors which were analytically distinct and capable of sustaining its conclusion even if the information from the Proxy Statement were excluded. As the district court rightly concluded, the shareholders' allegations suggested little more than that "a business agreement previously existed between [Virtue and Steve Wynn] where both parties could benefit financially," which "does not suggest a relationship that would indicate Virtue is beholden to S. Wynn." Moreover, the shareholders had the burden to plead particularized facts that at least two of the non-interested directors was beholden to Steve Wynn; thus, even if we were to reject the district court's conclusion that Virtue is independent, the shareholders' beholdenness theory would still fail.

B

We reach the same conclusion with respect to the district court's conclusion that the shareholders had not alleged

enough to suggest that the directors face a substantial likelihood of personal liability. The shareholders emphasize the district court's mention of "[t]he fact that the SEC and GCB determined there was no issue with the Macau donation." The shareholders appear to be right that in saying the SEC investigation was closed, the district court must have been referencing the content of the SEC's Form 8-K. Nevertheless, we conclude this was not reversible error for three reasons. First, there is no dispute that the district court's statement is true, meaning that this particular fact could have been judicially noticed. Fed. R. Evid. 201(b). Second, the district court's reasoning did not depend on the knowledge that the SEC had closed its investigation; instead, the district court offered the independent and alternative ground that "the mere allegation that [the SEC] is investigating the Macau donation is not enough to rise to the level to impute substantial likelihood of personal liability on the individually named defendants." Hence, once again, even if the district court's reference to extrinsic materials were excised, its analysis would still be sufficient to uphold its conclusions. Third, the shareholders' complaint itself states that the GCB investigation had "concluded its investigation . . . and found no violations."

V

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**