**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CITY OF CAMBRIDGE RETIREMENT
SYSTEM; MARTA/ATU LOCAL 732
EMPLOYEES RETIREMENT PLAN,
derivatively on behalf of the Western
Union company,

      Plaintiffs - Appellants,

and

STANLEY LIEBLEIN,

      Plaintiff,

v.

HIKMET ERSEK; JACK M.
GREENBERG; DINYAR S. DEVITRE;
RICHARD A. GOODMAN; BETSY D.
HOLDEN; LINDA FAYNE LEVINSON;
ROBERTO G. MENDOZA; SOLOMON
D. TRUJILLO; FRANCES M. FRAGOS
TOWNSEND; THE WESTERN UNION
COMPANY, a Delaware corporation,
nominal defendant,

      Defendants - Appellees.

No. 17-1381

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-00144-MSK-KLM)**
_____

Jeroen Van Kwawegen of Bernstein Litowitz Berger & Grossmann LLP, New York, New
York (David J. MacIsaac of Bernstein Litowitz Berger & Grossmann LLP, New York,

New York; Jeffrey A. Berens of Berens Law LLC, Denver, Colorado; and Michael I. Fistel, Jr. of Johnson Fistel LLP, Marietta, Georgia, with him on the briefs), for Plaintiffs-Appellants.

David F. Graham of Sidley Austin LLP, Chicago, Illinois (Hille R. Sheppard of Sidley Austin LLP, Chicago, Illinois; and Holly Stein Sollod and Christina Gomez of Holland & Hart LLP, Denver, Colorado, with him on the brief) for Defendants-Appellees.

_____

Before **MATHESON**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

In this shareholder-derivative action, Shareholders of The Western Union Company aver that several of Western Union's Officers and Directors breached their fiduciary duties to the company by willfully failing to implement and maintain an effective anti-money-laundering-compliance program (AML-compliance program), despite knowing of systemic deficiencies in the company's AML compliance. The Shareholders didn't make a pre-suit demand on Western Union's Board of Directors to pursue this litigation, and the district court found no evidence that such demand would have been futile. The district court thus dismissed the case, reasoning that the Shareholders' obligation to make a pre-suit demand on the Board was not excused. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Western Union is a public Delaware corporation that facilitates electronic money transfers through a sprawling international network of about 550,000 "agents"—individuals and entities that serve as storefronts where customers can send

2

or receive funds—located in over 200 countries and territories. Appellants' App. vol. 4 at 854–55, ¶ 14. Western Union's primary business flows through Western Union Financial Services, Inc. (WUFSI), a wholly-owned subsidiary which facilitates consumer-to-consumer money transfers. Western Union also offers business-to-business and business-to-consumer transfers through another wholly-owned subsidiary, Western Union Business Solutions.

Given its vulnerability to criminal exploitation, the money-transmittal industry is heavily regulated. Under the Bank Secrecy Act of 1970 (BSA), 31 U.S.C. §§ 5311–5332, financial institutions—including "money services businesses" like Western Union[1]—must implement and maintain effective AML-compliance programs. *See id.* § 5318(h)(1). At a minimum, these programs must provide for internal controls to guard against money laundering, for monitoring and independent compliance testing, and for personnel training. *See* 31 U.S.C. § 5318(h); 31 C.F.R. § 1022.210. A money-services business with foreign agents must also adopt risk-based approaches to cross-border transactions to help "guard against the flow of illicit funds." 69 F.R. 74439, 74440 (Dec. 14, 2004). Finally, financial institutions must maintain records and file reports on transmittals that exceed certain amounts or are "relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). "Structuring" or breaking transactions into smaller denominations to avoid the BSA's recordkeeping and reporting requirements is a crime. *Id.* § 5324.

---

[1] A "money services business" qualifies as a "financial institution" under the BSA. *See* 31 C.F.R. §§ 1010.100(t) & 1010(ff).

Regulators have long monitored Western Union's compliance with these requirements. Between 2002 and 2006, when Western Union became a public company, WUFSI entered into four settlement agreements concerning alleged AML violations with federal regulators and state authorities in Arizona, California, and New York. Without admitting liability, WUFSI promised to remedy deficiencies in its recordkeeping, reporting, and monitoring practices. Yet WUFSI struggled to achieve these objectives, and in 2008, it reached a second settlement with Arizona regarding alleged recordkeeping violations. A third settlement with Arizona followed in 2010: the Southwest Border Agreement (SBA).

The SBA centered on violations that occurred between 2003 and 2007 at 16 agent locations in the Southwest Border region—Arizona and the area within 200 miles north and south of the United States–Mexico border. WUFSI admitted that it had "reason to know" that agents at these locations had "knowingly engaged in a pattern of money laundering violations that facilitated human smuggling from Mexico into the United States through Arizona." Appellants' App. vol. 8 at 1933, ¶ 4. To remedy these violations, the SBA imposed a $94 million fine and mandated that WUFSI work with a court-appointed monitor to improve its AML compliance in the Southwest Border region. The SBA set a July 2013 completion deadline for this endeavor.

Three monitors served between 2010 and 2013, recommending a bevy of improvements to WUFSI's AML-compliance program. Western Union struggled to keep apace of these mounting proposals, implementing just 18 of (then) 80 proposals

4

by September 2011, 33 of 98 proposals by October 2012, and 54 of 98 proposals by April 2013. In July 2013—at the end of the initial monitorship—Western Union management advised the Board of Directors that certain improvements were "at a standstill." *Id.* vol. 3 at 777–78, ¶¶ 184–85. Management also reported the disturbing news that, in the first quarter of 2013, 28 of 335 high-risk agents in the Southwest Border region had "confirmed instances of Human Smuggling." *Id.* at 786, ¶ 214.

When Western Union failed to complete all the monitors' proposals by the July 2013 deadline, Arizona threatened to declare a willful and material breach of the SBA. Instead, recognizing their "mutual goal" that Western Union develop and maintain an effective AML-compliance program, the parties negotiated an amended SBA, extending the monitorship through December 2017. *Id.* vol. 8 at 1986. The Amended SBA also mandated more rigorous recordkeeping and reporting practices for transactions in the Southwest Border region.

As these events unfolded, numerous federal investigations into Western Union's AML compliance began to ramp up. In 2012, the U.S. Attorney's Office for the Central District of California named Western Union a "target" in an investigation into a California agent arrested for structuring transactions worth $65.7 million. *Id.* vol. 3 at 763, ¶ 137. Also in 2012, the Federal Trade Commission (FTC) began investigating Western Union's possible facilitation of fraudulent money transfers. Two years later, in 2014, the U.S. Attorney's Office for the Southern District of Florida named Western Union a target in an investigation into allegations of money

laundering by agents in Central America. Meanwhile,[2] the U.S. Attorney's Offices for the Eastern and Middle Districts of Pennsylvania started investigating Western Union for anti-fraud and AML violations.

Against this backdrop, various Shareholders filed five derivative actions in 2014 alleging that certain of Western Union's Directors had caused the company to willfully violate AML laws and regulations. In 2015, the district court consolidated these actions, and the Shareholders filed a consolidated complaint, asserting violations of the Securities Exchange Act of 1934, breaches of fiduciary duties, and Delaware common-law claims. The Directors moved to dismiss under Rule 23.1 of the Federal Rules of Civil Procedure, arguing that the Shareholders had failed to plead facts sufficient to show the futility of making a pre-suit demand on the Board to pursue litigation. The court granted the motion but gave the Shareholders leave to amend. Accordingly, on May 2, 2016, the Shareholders filed a first amended complaint (FAC), asserting two breach-of-fiduciary-duties claims. The Directors again moved to dismiss for failure to plead demand futility.

While that motion was pending, on January 19, 2017, Western Union entered into a deferred prosecution agreement (DPA) with the U.S. Department of Justice and the U.S. Attorney's Offices for the Central District of California, Southern District of Florida, and Eastern and Middle Districts of Pennsylvania. The DPA alleged that, between 2004 and 2012, Western Union had willfully failed to implement an

---

[2] The parties offer no evidence identifying when these investigations began.

6

effective AML-compliance program and take corrective action against agents engaged in fraud, money laundering, and structuring schemes. Western Union admitted these allegations, accepted responsibility, and agreed to penalties and conditions in exchange for having criminal charges dismissed after three years. That same day, Western Union also announced a settlement with the FTC in a related consumer-fraud enforcement action.

In light of these developments, the district court granted the Shareholders leave to amend their pleading. Accordingly, on March 17, 2017, the Shareholders filed a second amended complaint (SAC), adding 13 paragraphs addressing the settlement agreements. On April 21, 2017, the Directors filed a renewed motion to dismiss for failure to plead demand futility, which the district court granted on September 29, 2017. This appeal followed.

## ANALYSIS

The Shareholders concede that they made no pre-suit demand on Western Union's Board of Directors to pursue this litigation. Thus, we need decide only whether such demand would have been futile. We first address the standard of review applicable to Rule 23.1 dismissals before considering the legal sufficiency of the Shareholders' demand-futility allegations.

## I. Standard of Review

Our circuit has yet to decide what standard of review applies to dismissals under Rule 23.1 for failure to plead demand futility. *See In re ZAGG Inc. S'holder Deriv. Action*, 826 F.3d 1222, 1227 (10th Cir. 2016) (finding the standard of review

immaterial to the decision). The courts of appeals are split on this question, with the recent trend favoring de novo review over a discretionary standard.[3] We tend to agree with the trend towards plenary review, given that the issue whether demand is futile depends on the legal sufficiency of the complaint's allegations—a determination we typically review de novo. *See Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1212 (10th Cir. 2017). We see no sound reason to apply a different standard to a derivative pleading when we have "exactly the same task as when reviewing the dismissal of any other action." *Espinoza v. Dimon*, 797 F.3d 229, 235 (2d Cir. 2015) (explaining that an appellate court takes the complaint's allegations as true and decides whether

---

[3] Many circuits historically applied abuse-of-discretion review in derivative actions, reasoning that a dismissal for failure to adequately plead demand futility is highly fact-intensive. But the more recent trend is to apply de novo review, and at least five circuits now use that standard. *See, e.g.*, *F5 Capital v. Pappas*, 856 F.3d 61, 71 (2d Cir. 2017); *Cottrell on behalf of Wal-Mart Stores, Inc. v. Duke*, 829 F.3d 983, 990 (8th Cir. 2016); *Union de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs.*, 704 F.3d 155, 162–63 (1st Cir. 2013); *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 724–25 (7th Cir. 2013); *McCall v. Scott*, 239 F.3d 808, 817 (6th Cir. 2001). Still, several circuits have bucked this trend and continue to apply a discretionary standard. *See, e.g.*, *Louisiana Mun. Police Emps.' Ret. Sys. v. Wynn.*, 829 F.3d 1048, 1058 (9th Cir. 2016); *Freedman v. Redstone*, 753 F.3d 416, 423 (3d Cir. 2014); *Kammona v. Onteco Corp.*, 587 F. App'x 575, 581 (11th Cir. 2014); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 783 n.2 (D.C. Cir. 2008).

8

they state a claim under the appropriate demand-futility standard).[4] We therefore hold

that dismissals under Rule 23.1 are subject to de novo review.[5]

## II. Demand Futility

Derivative actions empower shareholders to "enforce a *corporate* cause of

action against officers, directors, and third parties." *Kamen v. Kemper Fin. Servs.,*

*Inc.*, 500 U.S. 90, 95 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)).

Because the cause of action belongs to the corporation, shareholders, as a

"precondition for the suit," must make a pre-suit demand on the corporation's board

of directors to pursue the litigation, "unless excused by extraordinary conditions." *Id.*

at 96 (quoting *Ross*, 396 U.S. at 534). Rule 23.1 requires the complaint to "state with

particularity" "any effort" to "obtain the desired action from the [corporation's]

---

[4] Notably, some courts of appeals have questioned the logic of deferential review in this context—even as precedent binds them to apply it. *See, e.g., Israni v. Bittman*, 473 F. App'x 548, 550 n.1 (9th Cir. Apr. 2, 2012) ("We question whether abuse of discretion review is appropriate."), *overruled in part on other grounds by Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553 (2017); *Raines*, 534 F.3d at 783 n.2 ("We tend to agree . . . that an abuse-of-discretion standard may not be logical in this kind of case . . . because the question whether demand is excused turns on the sufficiency of the complaint's allegations . . . .").

[5] As we noted in *In re ZAGG*, 826 F.3d at 1227, one of our earlier cases suggested that an abuse-of-discretion standard might be appropriate for dismissals under Rule 23.1. *See deHaas v. Empire Petroleum Co.*, 435 F.2d 1223, 1228 (10th Cir. 1970) (holding, in assessing demand futility, that nothing in the record "would indicate an abuse of discretion"). But in *deHaas*, the demand-futility question came before this court after a full trial, and the issue revolved around a "factual dispute." *Id.* Accordingly, *deHaas* does not prescribe our standard of review when a demand-futility issue arises on a motion to dismiss the complaint. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("The legal sufficiency of a complaint is a question of law . . . [that] is reviewed de novo.").

directors" and "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Whether the complaint's particular allegations suffice depends upon the substantive law of the state in which the entity is incorporated— here, Delaware. *See Kamen*, 500 U.S. at 108–09.[6]

Because the Shareholders didn't make a pre-suit demand on Western Union's Board, Rule 23.1 requires that they plead the reasons such demand would have been futile under Delaware law. In evaluating the Shareholders' pleading, we accept as true all particularized allegations of fact and give the Shareholders all reasonable inferences logically flowing from them. *See City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55–56 (Del. 2017). But "conclusory allegations are not considered as expressly pleaded facts or factual inferences." *White v. Panic*, 783 A.2d 543, 549 (Del. 2001) (citation omitted).[7]

Delaware law employs two tests for demand futility, the application of which turns on the nature of the allegations against the board. For allegations that the board

---

[6] Rule 23.1 pertains only to the "adequacy of the shareholder representative's pleadings"—it doesn't "*create* a demand requirement of any particular dimension." *Kamen*, 500 U.S. at 96. Rather, it "clearly *contemplates*" that such a requirement may apply under state substantive law. *Id.*

[7] The Shareholders downplay Rule 23.1's rigorous pleading requirements, arguing that the standard is "plaintiff-friendly" and citing numerous Rule 12(b)(6) cases to that effect. *See* Br. for Plaintiffs-Appellants at 38–39. Yet the Rule 23.1 inquiry is "more onerous" than Rule 12(b)(6). *McPadden v. Sidhu*, 964 A.2d 1262, 1269 (Del. Ch. 2008). Indeed, Delaware courts often cite Rule 23.1's particularized-pleading standard in contradistinction to the "plaintiff-friendly" standard of Rule 12(b)(6). *See, e.g.*, *Pfeiffer v. Toll*, 989 A.2d 683, 692 (Del. Ch. 2010); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 130 n.75 (Del. Ch. 2009).

acted in violation of its fiduciary duties, demand is excused if a "reasonable doubt" exists that (i) the directors are disinterested and independent or (ii) the transaction is "otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). By contrast, challenges to board *inaction* require a "reasonable doubt" that, when the lawsuit was filed, the board "could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). The *Rales* test includes derivative suits where "the subject . . . is a violation of the Board's oversight duties." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

In this case, the Shareholders do not challenge any discrete, affirmative Board action. Rather, they claim that the Board willfully failed to implement and maintain an effective AML-compliance program despite knowing of systemic deficiencies in Western Union's AML compliance.[8] Because this allegation describes inaction, it

---

[8] The Shareholders try to shoehorn their claims into the *Aronson* framework by using language evocative of affirmative action. The SAC, for example, characterizes this litigation as "aris[ing] from the deliberate decision of Western Union's board of directors . . . to ignore its mandate" to maintain adequate AML-compliance measures. Appellants' App. vol. 3 at 715, ¶ 2. Similarly, on appeal, the Shareholders refer to the Board's "business strategy" to boost profits while "willfully violating" AML laws, Br. for Plaintiffs-Appellants at 11–12, and argue that the Board "acted with the intent to violate positive law" by "condon[ing] management's efforts to hamper compliance," Reply Br. for Plaintiffs-Appellants at 19 n.9. Yet the SAC is wholly devoid of allegations—particular or otherwise—that the Board was ever informed of and affirmatively approved a deliberate course of illegal conduct. *See Louisiana Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340–41 (Del. Ch. 2012) (plaintiffs must "allege with particularity actual board involvement in a decision that violated positive law"), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013). As the district court

11

implicates the *Rales* test. *See Rales*, 634 A.2d at 933–34 (observing that *Aronson* is inapposite where the derivative action doesn't challenge a "business decision").[9]

To prevail under *Rales*, "a derivative complaint must plead facts *specific to each director*[] demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007). A director is considered interested[10] if filing suit would operate to his or her "personal benefit or detriment." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004). For that reason, a director who is sued may have a disabling interest for pre-suit demand

---

explained, the SAC's allegations reduce to the singular contention that the Board "was confronted with deficiencies in . . . management's conduct as to AML compliance" and that it "either condoned the deficiencies or remained consciously passive." Appellants' App. vol. 8 at 2163. In short, the Shareholders allege failures of *oversight*, not affirmative misconduct.

[9] In any event, the distinction between *Aronson* and *Rales* is immaterial in this case because the Shareholders claim that the Directors face liability from suit and are therefore incapable of impartially acting on a demand. *See Aronson*, 473 A.2d at 815 (reasoning that, if the challenged conduct is so "egregious" that it fails the business-judgment test, then "a substantial likelihood of director liability" excusing demand exists); *Rales*, 634 A.2d at 934 (excusing demand if the directors' risk of liability for failing to act renders them incapable of exercising their impartial business judgment); *see also Rosenbloom v. Pyott*, 765 F.3d 1137, 1150 (9th Cir. 2014) (noting that both tests excuse demand if the "particularized allegations create a reasonable doubt as to whether a majority of the board of directors faces a substantial likelihood of personal liability for breaching the duty of loyalty"); *In re SAIC Inc. Derivative Litig.*, 948 F. Supp. 2d 366, 382 (S.D.N.Y. 2013) (explaining that the two tests "may blur in cases like this one" where the risk of personal liability "may also implicate the question whether the Board can avail itself of business judgment protections"), *aff'd sub nom. Welch v. Havenstein*, 553 F. App'x 54 (2d Cir. 2014).

[10] The Shareholders do not challenge any Director's independence.

12

purposes. *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007). But a director's mere status as a defendant isn't sufficient to compromise the director's impartiality. *See Aronson*, 473 A.2d at 814 (rejecting this "bootstrap" argument). Rather, the director must face a "substantial likelihood" of personal liability.[11] *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003).

Directors owe fiduciary duties of care and loyalty to the corporation and its shareholders. *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). Where, as here,[12] the corporate charter exculpates directors from liability for duty-of-care violations, a "substantial likelihood" of liability requires allegations showing that the directors have breached their non-exculpated duty of loyalty. That duty entails, as a "subsidiary element," an obligation to act in good faith. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Liability for failure to act in good faith requires "qualitatively more culpable" conduct than gross negligence. *In re Walt Disney Co.*

---

[11] The Shareholders misstate this standard, asserting that demand is excused if a "reasonable doubt" exists that the Directors face "potential liability." Br. for Plaintiffs-Appellants at 3, 8–9, 35, 47, 50. In essence, they argue that the necessary quantum of liability risk is anything more than zero. Yet a "mere threat of personal liability . . . is insufficient to challenge either the independence or disinterestedness of directors." *Aronson*, 473 A.2d at 814. Instead, a "reasonable doubt" as to directors' impartiality "should only be found where a substantial likelihood of personal liability exists." *Wood*, 953 A.2d at 141 n.11 (citation omitted).

[12] Western Union's charter exculpates its Directors from liability "for breach of fiduciary duty . . . to the fullest extent permitted by Delaware law." Appellants' App. vol. 7 at 1872. Delaware law permits exculpation from monetary liability for breach of the duty of care but not for breach of the duty of loyalty. Del. Code Ann. tit. 8, § 102(b)(7). Accordingly, Western Union's charter exculpates liability only for duty-of-care violations.

13

*Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006). Indeed, it requires intentional bad-faith conduct, such as acting in pursuit of a disloyal purpose, acting with the "intent to violate applicable positive law," or consciously failing to act "in the face of a known duty to act." *Stone*, 911 A.2d at 369 (citation omitted).

Claims alleging failures of board oversight fall within the latter category and are considered "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). A *Caremark* claim requires particularized allegations that the board (i) "utterly failed to implement any reporting or information system or controls" or (ii) "having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. Under either theory, the directors must have consciously and in bad faith failed to discharge their fiduciary obligations. *Id.*; *see also Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 980–82 (Del. Ch. 2013) ("The essence of a *Caremark* claim is a breach of the duty of loyalty arising from a director's bad-faith failure to exercise oversight over the company.").

Here, the Shareholders don't appear to allege that Western Union's Board utterly failed to implement any reporting or information systems or controls. Nor could they credibly make such an argument, as nearly every settlement that Western Union has reached with federal and state authorities since 2002 has acknowledged Western Union's progress towards implementing an effective AML-compliance

14

program.[13] Instead, the Shareholders seem to argue that the Board consciously failed to monitor Western Union's AML compliance, thereby disabling itself from being informed of deficiencies requiring attention.

To prevail on such a claim under *Caremark*'s second prong, the Shareholders must plead with particularity that the Board was presented with "red flags" alerting it to misconduct at the company, *see Stone*, 911 A.2d at 373, and that it "consciously disregarded" those red flags, *see Good*, 177 A.3d at 59. Red flags serve as proxies for Board knowledge. Hence, the Shareholders must identify "obvious and problematic occurrences" supporting an inference that the Board knew of, but consciously ignored, material weaknesses in Western Union's internal AML policies. *See Rich*, 66 A.3d at 983.

Of course, whether the Board consciously ignored such red flags depends on *which* Board counts for purposes of evaluating demand futility. The Shareholders contend that the relevant Board is the 12-member Board that was constituted when

---

[13] *See* Appellants' App. vol. 7 at 1875 (New York: "[Western Union] has undertaken immediate corrective action."); *id.* at 1880 (Department of the Treasury: "[Western Union] promptly instituted comprehensive national corrective actions . . . ."); *id.* at 1886 (California: "[Western Union] has proactively taken corrective steps . . . ."); *id.* vol. 8 at 1919, ¶ 3 (SBA: "Western Union has developed and implemented a risk-based . . . [AML] compliance program."); *id.* at 1987, ¶ 2 (amended SBA: "Western Union has expended significant resources and has made substantial progress in completing the Monitor's Recommendations."); *id.* vol. 4 at 880, ¶ 100 (DPA: "Western Union took remedial measures and implemented compliance enhancements to improve its anti-fraud and anti-money laundering programs.").

they filed the FAC in May 2016.[14] Meanwhile, the Directors urge us to focus on the 11-member Board that was in place when the SAC was filed in March 2017.

Ordinarily, courts assess demand futility based on "the directors in office when [the shareholders] initiated [the] action." *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 (Del. Ch. 2015). If the shareholders amend their complaint, the relevant board becomes the one in place when the amended complaint is filed. *See Braddock v. Zimmerman*, 906 A.2d 776, 779 (Del. 2006). But the existence of a new board at that time "is relevant to a Rule 23.1 demand inquiry" only as to derivative claims in the amended complaint that are "not already validly in litigation." *Id.* at 785.

The term "validly in litigation" means "a proceeding that can or has survived a motion to dismiss." *Id.* at 779. Claims in an amended pleading meet this definition if (i) "the original complaint was well pleaded as a derivative action"; (ii) "the original complaint satisfied the legal test for demand excusal"; and (iii) "the act or transaction complained of . . . is essentially the same as the act or transaction challenged in the original complaint." *Id.* at 786. The first and second prongs are relevant to whether the proceeding survived dismissal, while the third prong examines the continuity between the pleadings.

---

[14] In their opening brief, the Shareholders appear to argue that the relevant Board is the one that was in place when this action first commenced in 2014. In their reply brief, however, they argue for the May 2016 Board.

Here, because the original complaint didn't survive dismissal, the Rule 23.1 demand inquiry reset when the Shareholders filed the FAC. *See id.* ("[A] complaint that has been dismissed is not validly in litigation."). The inquiry again reset when the Shareholders filed the SAC, at least for derivative claims that weren't validly stated in the FAC. *See In re Affiliated Computer Servs., Inc. S'holders Litig.*, No. 2821-VCL, 2009 WL 296078, at *8 (Del. Ch. Feb. 6, 2009) (analyzing whether claims in a second amended complaint were validly in the first amended complaint). The district court, of course, didn't dismiss the FAC—the Shareholders filed the SAC before it could. But the test for validity also asks whether a claim *can* survive dismissal, and the district court, in dismissing the SAC, explicitly stated that it would have dismissed the FAC for failure to plead demand futility. The FAC therefore wasn't valid under *Braddock*'s second prong.[15]

We see no error in this result. When the Shareholders filed the FAC in May 2016, Western Union's Board consisted of 12 Directors. Six of those Directors joined the Board in 2012 or later, well after most of the red-flag events that the Shareholders allege should have alerted the Board to AML-compliance issues—*i.e.*, settlements with federal and state authorities between 2002[16] and 2010. The FAC doesn't

___

[15] The Shareholders insist that the SAC added no additional claims from those in the FAC but instead merely "supplemented" the FAC's well-pleaded allegations. Reply Br. for Plaintiffs-Appellants at 20. Yet the continuity between the pleadings doesn't render the FAC valid. The FAC must have also satisfied the legal test for demand excusal, and the district court determined that the FAC failed that test.

[16] Of course, the Directors couldn't incur liability for failing to act on red flags occurring before 2006, when Western Union became a public company. Nonetheless,

17

mention the three newest Directors: Jeffrey Joerres (2015), Martin Cole (2015), and Robert Selander (2014). As for the other three—Francis Townsend (2013), Richard Goodman (2012), and Solomon Trujillo (2012)—the FAC alleges a general awareness of systemic deficiencies in Western Union's AML compliance. But it pleads no facts showing that any of those directors consciously disregarded any *contemporaneous* violations of specific requirements imposed by *past* settlements.

At most, the FAC alleges that Townsend, Goodman, and Trujillo attended numerous meetings at which management[17] apprised the Board of setbacks related to the ongoing SBA settlement. The FAC asserts that the *collective Board* remained "wholly passive" in the face of these setbacks, *see, e.g.*, Appellants' App. vol. 3 at 602, ¶ 9; *id.* at 688, ¶ 260, but it pleads no particularized facts showing how Townsend, Goodman, and Trujillo consciously and in bad faith failed to take remedial action, *see Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (requiring facts specific to the "*individual members* of th[e] board"). In fact, the FAC's own account suggests that, under these Directors' oversight, the company improved its compliance with the SBA. *Compare* Appellants' App. vol. 3 at 645, ¶ 131 (alleging

---

the Shareholders seem to allege that these earlier settlements alerted the Board to a longstanding pattern of AML violations and structural deficiencies in the company's internal AML-compliance policies.

[17] The FAC is replete with allegations concerning "management's" supposed resistance to implementing AML-compliance measures in accordance with the SBA. But the FAC lacks details about *who* constituted the "management" team tasked with implementing the SBA or *why* those specific individuals desired to thwart AML compliance. We cannot ascribe malicious motives to a nebulous, unnamed group of "managers."

that one of 91 monitor proposals were complete as of February 2012), *with id.* at 666, ¶ 199 (54 of 98 proposals as of April 2013). Though Western Union didn't achieve full compliance by the July 2013 deadline, the record belies the notion that Townsend, Goodman, and Trujillo had wholly abdicated their oversight duties.

The FAC thus fails to allege that Western Union's six newest Directors face a substantial likelihood of personal liability for consciously disregarding red flags of AML noncompliance. To validly state a *Caremark* claim, then, the FAC must create a reasonable doubt about the other six Directors' impartiality. *See Beam*, 845 A.2d at 1046 n.8 (explaining that demand to a board with an even number of members is futile if at least half are compromised). The FAC doesn't meet this threshold.

Aside from the six Directors discussed above, the Board in May 2016 included Hikmet Ersek (2010), Jack Greenberg (2006), Betsy Holden (2006), Linda Levinson (2006), Roberto Mendoza (2006), and Michael Miles (2006). Even assuming the FAC creates a reasonable doubt as to these Directors' impartiality,[18] its allegations about

---

[18] Though we needn't reach the issue, we doubt the FAC states a *Caremark* claim against the remaining six Directors. The FAC avers that the SBA alerted these Directors to ongoing AML violations, which they ignored. This mischaracterizes the SBA, which concerned *past* unlawful conduct occurring between 2003 and 2007 and not *ongoing* illegality. In fact, the SBA expressly recognized that, in the years since the violations, Western Union had "dedicated substantial resources" to improving its AML compliance. Appellants' App. vol. 8 at 1919, ¶ 3. The SBA thus supports the inference that Western Union's compliance was *improving* during these Directors' tenure on the Board.

The FAC also alleges failures of oversight related to the SBA, including that the Board had permitted management to oppose and thwart the court-appointed monitors' recommendations for improved AML compliance. For example, the FAC faults the Board for supporting a disagreement between management and the monitor over proposals for front-line associate sign-on controls and background checks. But

Levinson are immaterial to the demand-futility inquiry. On March 30, 2016, over a month before the FAC's May 2, 2016, filing, Levinson publicly disclosed that she would retire as of Western Union's May 12, 2016, annual meeting. Delaware courts have likewise excluded from the inquiry directors who have announced their

the mere existence of such isolated disagreements over the course of a multi-year relationship doesn't support an inference that management designed to *thwart* AML compliance. More important, the SBA obligated Western Union to *collaborate* with the monitor on AML-compliance issues, not simply to acquiesce to all the monitor's demands. Disagreements over *how* to approach AML compliance don't necessarily evince bad-faith opposition to AML compliance.

Similarly, the FAC urges an inference of conscious bad faith based on Western Union's failure to achieve full compliance with the SBA by the July 2013 deadline. This ignores that Western Union had implemented a majority of the monitors' proposals during the three years of the SBA's initial iteration. Such substantial progress belies the notion that the Board had consciously failed to monitor management's AML-compliance efforts. Presumably, a conscious failure of oversight would have resulted in a compliance rate much closer to zero, especially with a management team allegedly bent on thwarting such efforts.

In fact, the FAC details how management routinely reported to the Board on implementation progress and setbacks throughout the SBA's initial term, and how it presented plans for addressing open issues—demonstrating a functioning oversight system. The FAC emphasizes that early reports exhibited limited progress and that "major issues" remained open throughout the initial term. *See id.* vol. 3 at 667, ¶ 205. But this portrayal misleadingly omits that the SBA contemplated a three-year period for implementation. Partial implementation at the mid-stages of that period suggests meaningful efforts at compliance, not bad faith. Indeed, though early reports showed sluggish progress, management informed the Board in late 2012 that it was on track to full compliance by the July 2013 deadline. The Board properly relied on this healthy forecast and allowed management to continue its efforts.

Ultimately, the insistence on inferring bad faith from Western Union's failure to achieve full implementation by the initial deadline improperly "equate[s] a bad outcome with bad faith." *See Stone*, 911 A.2d at 373. *Particularized* allegations must support such an inference, not speculative deduction. The Shareholders' protestation that inferring the Board's *good faith* is improper inverts their burden: they must proffer particularized facts sufficient to support an inference of bad faith. Such an inference doesn't logically flow from the conclusory allegation that Western Union's failure to achieve compliance stemmed from bad faith.

20

impending retirement. *See Park Emps.' Annuity & Benefit Fund of Chicago v. Smith*, No. 11000-VCG, 2016 WL 3223395, at *1, *8-11 (Del. Ch. May 31, 2016), *aff'd*, 175 A.3d 621 (Del. 2017). As the court in *Smith* explained, demand futility should be determined by reference to "the board that would *actually* be tasked with determining whether or not the corporation will pursue the litigation." *Id.* at *9.

The Shareholders attempt to distinguish *Smith*, arguing that the plaintiffs in that case filed a complaint just four days before an uncontested election to replace a majority of the directors, who were retiring. They note that here, by contrast, they asserted allegations against Levinson in their original complaint in January 2014—over two years before she declared her intent to retire. Yet demand futility is assessed as of the filing of the complaint that first states valid claims, and the original complaint wasn't valid because it didn't survive a motion to dismiss. *See Braddock*, 906 A.2d at 779. Thus, assuming, *arguendo*, the FAC's validity, the relevant comparison is between the FAC's filing just ten days before Levinson's retirement and the complaint's filing four days before the directors' retirement in *Smith*.

The Shareholders also highlight that they filed the FAC within 30 days of the district court's order dismissing the original complaint, "a date that was not within Plaintiffs' control." Reply Br. for Plaintiffs-Appellants at 22. This, too, is irrelevant. Levinson's impending retirement was a matter of public record in Western Union's SEC filings as early as March 30, 2016—well before the Shareholders filed the FAC and even before the district court dismissed the original complaint. Regardless of the

21

district court's disposition of the motion to dismiss, the Shareholders had ample notice that Levinson would be disabled from considering any litigation demand.

Thus, excluding Levinson from the analysis, the FAC alleges—at most—that five of 11 Directors on the Board at the time of the FAC's filing risked personal liability. Demand to a board with an uneven number of members is futile only if a majority is disabled from considering the demand. *See Aronson*, 473 A.2d at 817. Allegations impugning the impartiality of five of 11 Directors fail to meet this threshold, meaning the FAC wasn't validly in litigation because it would have been dismissed for failing to satisfy the "legal test for demand excusal." *See Braddock*, 906 A.2d at 786.

The relevant Board for demand-futility purposes, then, is the 11-member Board in place when the SAC was filed in March 2017. Yet, with the exception of Levinson, the Board in March 2017 was identical to the Board in May 2016, and the SAC alleges no additional facts that would render demand to that Board futile. The SAC primarily adds allegations concerning the DPA, which addresses criminal AML violations that occurred between 2004 and 2012. The SAC seems to allege that the Directors as of March 2017 risked personal liability for those violations because they all had served for at least part of the period during which the violations occurred. Yet the SAC doesn't particularly allege that the Board was aware of these violations when they happened, much less that any individual Director consciously and in bad

22

faith had failed to take corrective action.[19] Rule 23.1's rigorous pleading standard

isn't satisfied absent particularized allegations as to *what* each Director knew and

*how* they acted on that knowledge.[20]

The criminal misconduct that the DPA describes is certainly troubling, but the

SAC fails to establish that a majority of Western Union's Board in March 2017 faced

a substantial risk of personal liability for consciously disregarding that misconduct.

*See Guttman*, 823 A.2d at 501. Thus, because the Board could have impartially acted

on a pre-suit demand to pursue litigation, we hold that the Shareholders' obligation to

make such a demand wasn't excused. *See Rales*, 634 A.2d at 934.

## CONCLUSION

For the above reasons, we affirm the district court.

---

[19] Indeed, the only Director that the SAC purports to connect to the DPA is Ersek, and even then, it does so only implicitly. *See* Appellants' App. vol. 3 at 801, ¶ 265 (alleging that Western Union admitted its "Chief Executive Officer . . . knew about AML violations").

[20] The DPA itself doesn't supply such allegations. It describes how Western Union "employees" willfully failed to discipline agents who knew of, but failed to address, consumer fraud complaints related to transactions at foreign agent locations. Appellants' App. vol. 4 at 852, ¶ 2. It further describes failures to take corrective action against four domestic agents who violated Western Union's own policies against structuring transactions. The DPA doesn't attribute knowledge of this criminal misconduct either to the Board or to any individual Director. Nor does it support an inference that the Board consciously disregarded the misconduct. In fact, it notes that between 2010 and 2012, Western Union terminated the agents engaged in structuring transactions. It also notes that, in the wake of these terminations, Western Union undertook "remedial measures and implemented compliance enhancements" which demonstrate its "commitment to maintaining and enhancing the effectiveness of its compliance program." *Id.* at 880, ¶ 100. Such steps hardly evince a Board that is consciously blind to AML violations.